**Michael E. SPIESS et al., Plaintiffs,**

v.

**C. ITOH & CO. (AMERICA), INC., Defendant.**

**Civ. A. No. 75–H–267.**

United States District Court, S. D. Texas, Houston Division.

Jan. 29, 1976.

J. Anthony Hale, Foreman, Dyess, Prewett, Rosenberg & Henderson, Houston, Tex., for plaintiffs.

Neil Martin, Fulbright & Jaworski, Houston, Tex., for defendant.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

### I. INTRODUCTION

Plaintiffs, white American citizens of non-Japanese national origin, have filed suit on behalf of themselves and all other non-secretarial personnel of non-Japanese national origin who have been, are now, or might be employed by defendant, an American corporation wholly owned by C. Itoh & Co., Ltd., of Japan. Plaintiffs allege that defendant discriminates in its employment practices against the class on the basis of national origin, race and color, in violation of 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981.[1]

---

1. In part, plaintiffs' complaint points to discriminatory practices allegedly committed by defendant against them because they are white persons working in a company controlled racially by Oriental persons of Japanese national origin. Nothing in the complaint indicates that white persons are in the majority in defendant's organization or that defendant discriminates against white persons solely to achieve a racial balance (or "quota") in employment.

This case therefore does not present a challenge on racial grounds to defendant's operation of an affirmative action program or a "quota" system. *Cf. DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *see generally* Comment, *Last Hired, First Fired Layoffs and Title VII,* 88 Harv.L. Rev. 1544 (1975); Posner, *The Constitutionality of Preferential Treatment of Racial Minorities,* 1974 Sup.Ct.Rev. 1 (1974).

Rather, plaintiffs complain of invidious "reverse" discrimination. That is, the discrimination is alleged to have been committed by a non-white controlling racial group, which is Oriental Japanese, against a "minority" racial group of discriminatees, including white persons and other persons whose national origin is not Japanese and who are not members of the Oriental race.

Defendant has moved to dismiss the § 1981 claim contending that plaintiffs, as white American citizens, have no standing to bring an action under § 1981. Alternatively, defendant contends that even if plaintiffs have standing to bring suit on behalf of its non-Japanese employees who are not white American citizens, plaintiffs themselves cannot state a claim upon which relief can be granted as to them because they are white American citizens.

 Upon exhaustive review of existing case law and supporting legal authority, this Court no longer agrees with defendant's contentions and hereby withdraws an opinion to the contrary entered in this case on May 9, 1975. After carefully evaluating as of this time appropriate judicial, scholarly and legislative authorities, the Court concludes that the statutory language, the legislative history and the more persuasive judicial interpretations of 42 U.S.C. § 1981 in light thereof support the view that plaintiffs have standing to bring this action and that they may also state a claim upon which relief can be granted as to them solely because they allege discrimination on the basis of their white race.[2] Plaintiffs further have standing to bring this action on behalf of other non-Japanese persons who are non-whites and are alleged to be discriminatees.[3]

## II. THE LANGUAGE OF THE STATUTE

To clarify the somewhat confusing and complicated statutory interpretation which is generated when white citizens sue under § 1981, this Court must begin with an examination of the wording of the subject statute and its centenarian antecedents. The post-war statute as originally enacted provided as follows:

"Be It Enacted by the Senate and House of Representatives of the United States of America in Congress Assembled,

"That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, *of every race and color,* without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of persons and property, *as is enjoyed by white citizens,* and shall be subject to like punishment, pains and penalties, and to none other, any law, statute,

---

**2.** This Court has previously ruled to the contrary on the question of white citizens' standing to sue under § 1981 in another case. *McDonald v. Santa Fe Trail Transp. Co.,* Civil Action No. 71–H–891 (S.D.Tex. May 2, 1974), *aff'd per curiam,* 513 F.2d 90 (5th Cir.), *cert. granted,* 423 U.S. 923, 96 S.Ct. 264, 46 L.Ed.2d 248 (1975). The impact on the instant case of this prior decision and its subsequent case history is discussed later in this opinion. *See* Part IV.C.3, *infra.*

**3.** The controversy over the standing of white citizens under § 1981 arises solely from the presence and wording of the comparative phrase "as is enjoyed by white citizens." As will be seen, the Court concludes that this phrase should not deprive white citizens of standing or the ability to state a claim upon which relief can be granted within the § 1981 context.

No parallel inquiry is necessary on this issue under Title VII, 42 U.S.C. § 2000e, because no parallel controversy exist as to the standing of any particular racial group. The statute by its language declares discrimination on account of *any* individual's race, color or national origin to be a proscribed employment practice. 42 U.S.C. § 2000e–2(a)(1); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Title VII mandates that each employee be evaluated in his employment solely on the basis of his own qualifications and not be deprived of employment opportunity on the basis of a racial, national origin or color classification. 401 U.S. at 431, 91 S.Ct. 849. Like all other protected persons, white employees are thus entitled under Title VII to enjoy freedom from discrimination on account of their race, color or national origin.

ordinance, regulation, or custom, to the contrary notwithstanding." (Emphasis added)

Act of April 9, 1866, c. 31, § 1, 14 Stat. 27, re-enacted by § 16 of the Enforcement Act of 1870, Act of May 31, 1870, c. 114, § 16, 16 Stat. 140, 144 (1870).[4]

The present codification of § 1981 is derived from Revised Statutes § 1977 (1874), which codified the Act of May 31, 1870, § 16, 16 Stat. 144. The current version of 42 U.S.C. § 1981 provides as follows:

> "*All persons* within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property *as is enjoyed by white citizens,* and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." (Emphasis added)

The first italicized phrases in both the original and modern versions—"citizens of every race and color" (original); "all persons" (modern)—suggest by their wording that white citizens are included in the category of persons protected from discrimination on the basis of race. If this phrase stood alone, there would be no difficulty in straightforwardly applying the statute to white citizens. The second italicized phrase in both versions —"as is enjoyed by white citizens"— complicates any such straightforward application.

4. Section 1 of the 1866 Civil Rights Act discusses both contractual and property rights as rights which are protected from being abridged by racial discrimination. This original version was subsequently re-codified into two statutes, the current versions of which are 42 U.S.C. §§ 1981 and 1982.

5. AMENDMENT XIII–SLAVERY ABOLISHED
 "*Section 1.* Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Considering the first and second phrases together, at least three statutory interpretations suggest themselves: (1) that the phrases "citizens of every race and color" (original) and "all persons" (modern) contradict the phrase "as is enjoyed by white citizens"; (2) that the phrase "as is enjoyed by white citizens" qualifies and limits the protection of the statute to aliens and non-white American citizens; or (3) that the phrase "as is enjoyed by white citizens" represents a barometer with which to measure protection afforded to rights now to be enjoyed by all persons regardless of race which were enjoyed as a matter of law prior to 1866 only by white citizens, the group then racially "favored".

To assess the accuracy of these and other possible interpretations of the statute, this Court must gauge the intent and prevailing mood of Congress when it enacted the 1866 Civil Rights Act by examining available legislative history for § 1 of that Act.

## III. LEGISLATIVE HISTORY OF THE STATUTE

### A. The Senate Version

Amidst the crescendo of post-Civil War emotion, and in the wake of the ratification of the Thirteenth Amendment to the United States Constitution on December 18, 1865,[5] the Civil Rights Act was introduced in the Senate as Senate Bill 61 on January 5, 1866, by Senator Lyman Trumbull, chairman of the Senate Judiciary Committee.[6] Cong. Globe, 39th Cong., 1st Sess. 129 (1866).

"*Section 2.* Congress shall have power to enforce this article by appropriate legislation.
 "PROPOSED on January 31, 1865, 38th Cong., 2d Sess.; RATIFIED on December 18, 1865."

6. Senator Trumbull was a moderate Republican who favored the abolition of slavery before the Civil War and who zealously supported the Union during the War. T. White, Lyman Trumbull (1956). At war's end, Trumbull was less concerned than his fellow Northern legislators with punishing the rebel states for their rebellion. M. Krug, Lyman Trumbull: Conservative Radical (1966). Rather, he was

To Senator Trumbull, the term "civil rights" comprehended certain fundamental rights which all persons had, regardless of their race, color or any other factor which was subject to discrimination. References to race and color, nevertheless, were inserted into the bill to undercut the vitality of "Black Code" laws in the Southern states. *See* Cong. Globe, 39th Cong., 1st Sess. 474–76 (1866). Trumbull therefore envisioned an immediate goal by referring in the bill to race and color—striking down the most visible manifestation of *de jure* racial segregation (the "Black Codes")—and a long-range goal by creating a new definition of "civil rights"—affirmatively securing "for all men, *whatever their race or color,* the great fundamental rights." Cong. Globe, 39th Cong., 1st Sess. 599 (1866) *cited in Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 432, 88 S.Ct. 2186, 20 L.Ed. 1189 (1968) (emphasis added).

Thus, as he emphasized to his fellow Senators, his bill contained no comparative phrase such as "as is enjoyed by white citizens":

"[A]ny statute which is not equal to all, and which deprives any citizen of civil rights which are secured to other citizens, is an unjust encroachment upon his liberty; and is, in fact, a badge of servitude which, by the Constitution, is prohibited."

Cong. Globe, 39th Cong., 1st Sess. 472 (1866).

The desire to ensure the equal treatment of all men by his legislation was reiterated by Senator Trumbull during floor debates after the bill was reported out of committee unchanged on January 11, 1866, and sent for consideration to the full Senate on January 29. To an attack on the bill by one of its opponents, Senator Garrett Davis of Kentucky, on February 2, Trumbull responded as follows from the floor of the Senate:

"Sir, *this bill applies to white men as well as black men.* It declares that all persons in the United States shall be entitled to the same civil rights, the right to the fruit of their own labor, the right to make contracts, the right to buy and sell, and enjoy liberty and happiness; and that is abominable and iniquitous and unconstitutional! Could anything be more monstrous or more abominable than for a member of the Senate to rise in his place and denounce with such epithets as these a bill, the only object of which is to secure equal rights to all the citizens of the county, *a bill that protects a white man just as much as a black man*? With what consistency and with what face can a Senator in his place here say to the Senate and the country that this is a bill for the benefit of black men exclusively when there is no such distinction in it, and when the very object of the bill is to break down all discrimination between black men and white men?" (Emphasis added)

Cong. Globe, 39th Cong., 1st Sess. 599 (1866).

While Southern Senators such as Davis and Guthrie of Kentucky opposed the bill on racial grounds, *see, e. g.,* Cong. Globe, 39th Cong., 1st Sess. 598 (remarks by Senator Davis); *Id.* at 601 (remarks by Senator Guthrie), the bill also drew Northern opponents, such as Cowan of Pennsylvania, Saulsbury of Delaware, and Van Winkle of West Virginia. Undoubtedly, some of their opposition was inspired by racial considerations, since racial equality was not a reality in many Union states.[7] However, they also bottomed their opposition upon two significant constitutional questions: the authority of the Congress to endow former slaves with citizenship solely by legisla-

more interested in preserving through legislation the Union's military victory by statutorily revolutionizing the term "civil rights". He thus intended that his proposed civil rights bill would endure in character and would protect all persons of the United States in their civil rights and furnish the means of their vindica-

tion. 2 James G. Blaine, Twenty Years in Congress 172 (1884) ("Blaine").

7. *See* H. K. Beale, The Critical Year: A Study of Andrew Johnson and Reconstruction (1930) ("Beale").

tive enactment; and the extent to which states' rights could be abrogated by decree of the Congress through proposed utilization of the federal judiciary to enforce newly-created federal civil rights.

Senator Cowan, for example, restrictively read the second section of the Thirteenth Amendment to permit only legislation designed to break the bonds by which Negroes were enslaved. He strenuously objected to a blanket attempt by Congress to exercise power to enact this bill while lacking, in his view, an appropriate constitutional base. He did not believe that Congress could endow citizenship upon non-citizens solely through the exercise of legislative authority. Cong. Globe, 39th Cong., 1st Sess. 603 (1866).

Northern and Southern Senators alike decried the interjection of federal authority into state affairs which the bill contemplated in its enforcement provisions. *See, e. g.,* Cong. Globe, 39th Cong., 1st Sess. 603 (remarks by Senator Cowan). They saw in the impact of the bill a usurpation of traditional state functions such as the punishment of civil liberties' violations. Cong. Globe, 39th Cong., 1st Sess. 601 (remarks by Senator Guthrie).

Regardless of the conflicting views of the Senators as to the bill's impact on citizenship and the balance of power in federal-state relations, a consensus about the equal treatment of all citizens was expressed by all debaters as an assured result of the bill. For example, Senator Cowan agreed that all persons should have equal civil rights. Cong. Globe, 39th Cong., 1st Sess. 603 (1866). Senator Davis of Kentucky saw the act as an attempt to confer certain enumerated rights on "all the inhabitants of the United States, of every race and color[.]" *Id.* at 598 (1866).[8]

In spite of the political and constitutional objections to the bill, the Senate passed it on February 2, 1866, by a vote of 33 to 12, Cong. Globe, 39th Cong., 1st Sess. 606–07 (1866), and sent it to the House of Representatives for consideration.

### B. The House Version

The bill immediately went to the House, and on March 1, 1866, the House proceeded to consider it without its first being referred to the House Judiciary Committee. The chairman of the committee, James Wilson of Iowa, was also floor manager of the bill. Representative Wilson indicated to the full assembly that the bill had been considered informally by the committee and was being brought up for action from the floor at once in order to save time. Cong. Globe, 39th Cong., 1st Sess. 1118 (1866).[9]

Mr. Wilson then spoke in support of the bill:

"[C]ivil rights are the natural rights of man; and these are the rights

8. The controversy over Congressional efforts to affect citizenship did produce one amendment to the bill. During the floor debates, Senators Guthrie of Kentucky and Howard of Michigan inquired of Senator Trumbull whether his proposed section on citizenship would have the effect of naturalizing Indians in the United States. 2 Blaine, *supra,* at 173. Trumbull did not believe it would have that effect, but agreed to modify the bill to exclude "Indians not taxed" from its protection. Cong. Globe, 39th Cong., 1st Sess. 497 (1866).

The discussion of citizenship then shifted to a consideration of the impact of the Chinese population in California. Senator Cowan worried whether the bill would have the effect of naturalizing children born in this country of Chinese parents, thus creating the possibility of an Oriental majority in California. Senator Trumbull stated that the bill would naturalize Chinese children and conceivably could result one day in shifting the balance of California's population. *Id.*

The possibility of a shift in population control was therefore foreseen by Senator Trumbull as one of the by-products of his bill. The possibility of such a by-product reinforces an interpretation of the bill to support protection of all persons, including white citizens. Though Trumbull appreciated the superior position enjoyed by white citizens as of the close of the Civil War, his answer reflects recognition of a potential future shift in racial numerical domination. This possibility did not concern him because he intended that his bill would protect all persons, regardless of the racial balance of the moment.

9. *See* 2 Blaine, *supra,* at 174.

which this bill proposes *to protect every citizen* in the enjoyment of throughout the entire dominion of the Republic."

\* \* \* \* \* \*

"A colored citizen shall not, because he is colored, be subjected to obligations, duties, pains, and penalties from which other citizens are exempted. Whatever exemptions there may be *shall apply to all citizens alike. One race shall not be more favored in this respect than another.* One class shall not be required to support alone the burdens *which should rest on all classes alike.* This is the spirit and scope of the bill, and it goes not one step beyond.

"Mr. Speaker, I think I may safely affirm that this bill, *so far as it declares the equality of all citizens* in the enjoyment of civil rights and immunities, merely affirms existing law. We are following the Constitution. We are reducing to statute form the Spirit of the Constitution. We are establishing no new right, declaring no new principle. It is not the object of this bill to establish *new rights,* but to protect and enforce those *which already belong to every citizen."*

\* \* \* \* \* \*

"Laws barbaric and treatment inhuman are the rewards meted out by our white enemies to our colored friends. We should put a stop to this at once and forever. And yet I would not do this in a way *which would deprive a white man of a single right to which he is entitled.* I would merely enforce justice for all men." (Emphasis added)

Cong. Globe, 39th Cong., 1st Sess. 1117–18 (1866).

Wilson proposed several minor amendments to the bill, including an amendment to insert the phrase "as is enjoyed by white citizens". Cong. Globe, 39th Cong., 1st Sess. 1115 (1866). The addition of this phrase draws no comment from the historians of the period, nor from the members of the House according to Representative Blaine. Rather, the primary concerns of House members were twofold: whether the term "civil rights" included the right of suffrage so that the suffrage would be extended to Negroes in the South; and whether the bill would affect Southern anti-miscegenation statutes. *Id.*

At the time he proposed the amendment in question, Representative Wilson did not explain his reason for adding the phrase, but he subsequently remarked in the course of general debate that the phrase was not intended to restrict the bill's coverage to non-whites alone:

"Mr. Speaker, if all our citizens were of one race and one color we would be relieved of most of the difficulties which surround us. This bill would be almost, if not entirely, unnecessary, and if the States, seeing that we have citizens of different races and colors, would but shut their eyes to these differences and legislate, so far at least as regards civil rights and immunities, as though all citizens were of one race and color, our troubles as a nation would be well-nigh over. But such is not the case, and *we must do as best we can to protect our citizens,* from the highest to the lowest, *from the whitest to the blackest, in the enjoyment of the great fundamental rights which belong to all men."* (Emphasis added)

Cong. Globe, 39th Cong., 1st Sess. 1118 (1866).

Other Congressmen concurred in the view expressed by Wilson that the proposed statute would eradicate all discrimination on the basis of race or color. For example, shortly after the above-quoted statement of Wilson was made, Congressman Burton Cook of Illinois declared from the floor:

"I have examined this bill with some care, and so far as I have been able to understand it I have found nothing in any provision of it which tends in any way to take from any man, white or black, a single right he enjoys under the Constitution and laws of the United States."

\* \* \* \* \* \*

"[W]ith respect to basic civil rights—including 'the right to purchase, lease, sell, hold, and convey property,' Congress must provide that there be no discrimination on grounds of race or color."

Cong. Globe, 39th Cong., 1st Sess. 1123–24 (1866). Comments of a like tenor are rendered by Congressman Russell Thayer of Pennsylvania, *Id.* at 1152, and Congressman William Windom of Minnesota, *Id.* at 1159.

After further debate, the House passed the bill as amended on March 13, 1866, by a vote of 111 to 38, Cong. Globe, 39th Cong., 1st Sess. 1367 (1866), and returned the bill to the Senate on March 15 for re-consideration in light of the amendments. *Id.* at 1413.

## C. Senate View of the House Version

The phrase "as is enjoyed by white citizens" was critically appraised by the Senate after the bill as revised returned from the House via a joint conference committee. The proper perspective with which to view the meaning of the phrase was discussed in a colloquy which took place between Senator Trumbull and Senator Van Winkle of West Virginia:

"MR. VAN WINKLE. There seems to be an incongruity in this language to which I wish to call the attention of the chairman of the committee. The clause commences with the words 'and such citizens.' As I understand those words they include all persons who are or can be citizens, white persons and all others. The clause then goes on to provide that 'such citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, shall have the same right to make and enforce contracts,' &c., 'as is enjoyed by white citizens.' It seems to me these words are superfluous. *The idea is that the rights of all persons shall be equal*; and I think the clause, leaving out these words, would attain the object. This is mere-

ly a verbal criticism. I think the bill is incongruous in expression as it stands.

"MR. TRUMBULL. I quite agree with the Senator from West Virginia that these words are superfluous. *I do not think they alter the bill*. I think the bill would be better without them, but they have been adopted by the House of Representatives. *We did not think they altered the meaning of the bill*; and we did not think it worth while to send the bill back just because these words were inserted by the House. They thought there was some importance in them and have inserted them; and *as in the opinion of the committee which examined this matter they did not alter the meaning of the bill,* the committee thought proper to recommend a concurrence, and I hope the Senate will concur in it." (Emphasis added)

Cong. Globe, 39th Cong., 1st Sess. 1413 (1866).

The Senate then approved the conference committee's report, adopted the bill as amended and sent it to President Johnson for his signature. *Id.*

## D. Presidential Veto of the Bill; Congressional Override of the Veto

President Andrew Johnson vetoed the bill and sent a message to Congress stating his reasons on March 27, 1866.[10] President Johnson was amenable to the views of northern Democrats and southerners on questions touching upon racial equality. Thus, at one point in his veto message, President Johnson declared: "[T]he distinction of race and color is, by the bill, made to operate in favor of the colored and against the white race." *See* note 10, *supra*. Nevertheless, even he recognized that the real intention of the bill as to race discrimination was to provide for the equal treatment of all races before the law:

"Thus a *perfect equality* of the white and black races is attempted to

---

10. *See* E. McPherson, Political History of the Period of Reconstruction, 1865–1870 at 75 (1972) ("McPherson").

be fixed by the Federal law, in every State of the Union, over the vast field of State jurisdiction covered by these enumerated rights. In no one of these can any State ever exercise any power of discrimination between the different races."

Cong. Globe, 39th Cong., 1st Sess. 1679–80 (1866).[11]

Upon return of the bill to the Senate, Senator Trumbull replied to the veto message on April 4. Cong. Globe, 39th Cong., 1st Sess. 1755 (1866). The veto was overridden on April 6 in the Senate by a margin of 33 to 15, and on April 9 in the House by a margin of 122 to 41. One year after the Civil War had ended, the 1866 Civil Rights Act was enacted into law on April 9, 1866.

### E. Conclusion

A careful review of the legislative history of § 1981 causes this Court to conclude that the 1866 Congress intended: (a) that white citizens have standing to sue under § 1981; and (b) that they be able to state a claim upon which relief could be granted as to them solely by alleging discrimination against them on the basis of their race, Caucasian. The statute as written and as amplified by the legislative history establishes the principle of equal treatment: all persons regardless of race have certain rights which are to be protected from abridgment by racial discrimination.

The phrase "as is enjoyed by white citizens" does not diminish the impact of this far-reaching principle. White citizens in 1866 were in the numerical majority in population in the United States, enjoyed political dominance in government and enjoyed the untrammeled exercise of enumerated civil rights. At most, therefore, this phrase constituted, in 1866, a comparative instrument by which to measure the relative protection from abridgment of enumerated civil rights on account of racial discrimination to be accorded to all persons, including white citizens, in the exercise of rights then enjoyed solely by white citizens.

The Court is aware that extensive recitation of, and reliance upon, the legislative history of the 1866 Civil Rights Act have been criticized. E. g., Jones v. Alfred H. Mayer Co., 392 U.S. 409, 457–76, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (Harlan, J., dissenting); Casper, Jones v. Mayer: Clio, Bemused and Confused Muse, 1968 Sup.Ct.Rev. 89 (1968); see Comment, Section 1981 and Private Groups: The Right to Discriminate Versus Freedom from Discrimination, 84 Yale L.J. 1441, 1447 n. 31 (1975); Comment, Curbing Exploitation in Segregated Housing Markets, 10 Harv.Civ.Rts.—Civ.Lib.L.Rev. 705, 706 n. 5 (1975). Nevertheless, to this Court the legislative history is not controversial on the question of Congress' intent to proscribe all racial discrimination including discrimination against white citizens. Bu-

11. President Johnson's fundamental concern was the impact of the bill on the balance of power between the Congress and the Presidency. He was also totally opposed to permitting Congress to override state efforts to correct racial imbalances and inequities. Thus, he was motivated to veto the bill as a matter of executive power, not hard opposition to a national policy of racial equality. His motivation was buttressed by the encouragement of Senator Cowan of Pennsylvania, who felt that Congress' legislative expression had exceeded the boundary of its constitutional authority. See Beale, supra, at 222.

Nevertheless, President Johnson perceived a need to camouflage his real intentions vis-a-vis the Congress. Thus, to conceal his attack on the bill's alleged efforts to overcentralize government, he initiated his veto by pitching

his opposition in racial terms. Id. In reality, President Johnson may not have conceived the need to express such racial opposition. The opposition more likely stemmed from his reliance upon the language and tenor suggested by those of his speech-writing advisers who expressed most boldly to him in their drafts of a proposed veto message their fear of the increased strength of the Congress. His reliance upon the suggestions of these advisers produced the strong racially biased expressions in the veto message, because these advisers not only opposed expansion of Congressional power, they also abhorred the concept of racial equality. Cox & Cox, Andrew Johnson and His Ghost Writers: An analysis of the Freedmen's Bureau and Civil Rights Veto Messages, 48 Miss. Valley Hist.Rev. 460, 472–79 (1961) ("Cox & Cox").

chanan, *The Quest for Freedom: A Legal History of the Thirteenth Amendment (Chapter I),* 12 Houston L.Rev. 1, 20–22 (1974).[12]

The criticism directed at reliance upon the legislative history, especially Justice Harlan's dissent in the *Jones v. Mayer* case, emphasizes the controversiality of interpreting the legislative history to enforce 42 U.S.C. §§ 1981 and 1982 to proscribe private as well as public discrimination through the use of the enforcement clause of the Thirteenth Amendment. *See generally* Comment, *Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments,* 74 Colum.L.Rev. 449 (1974). To this Court, such criticism does not extend to the more compelling conclusion that white citizens are afforded a remedy under § 1981. Congressional critics and eulogizers alike saw this as an end result of the 1866 Civil Rights Act.

## IV. JUDICIAL INTERPRETATION OF THE STATUTE

### A. Introduction

The legislative history of the predecessor statute to 42 U.S.C. § 1981 compels the conclusion that white citizens legislatively are afforded a remedy under § 1981. The legislative history demonstrates Congress' efforts, on the basis of the Thirteenth Amendment, to eradicate all racial discrimination and to codify federal protection from such discrimination for all persons, whites included. Judicial interpretations, on the other hand, have produced no such corresponding uniform conclusion in the application of § 1981.

### B. Early Interpretation: 1866–1906

#### 1. First Reading

The federal judiciary was attuned initially to Congress' intent to expand protection of certain fundamental rights, and judicial interpretations were closely aligned with its will.

The law was declared constitutional in two early cases heard by Justices of the Supreme Court sitting in their capacity as Circuit Justices. *United States v. Rhodes,* 27 F.Cas. 785 (No. 16,151) (C.C. D.Ky.1866) (Swayne, J.); *In re Turner,* 24 F.Cas. 337 (No. 14,247) (C.C.D.Md. 1867) (Chase, C. J.). In both cases, the Act was held to be a permissible exercise of Congressional authority pursuant to the Thirteenth Amendment.

Justice Bradley later endorsed this holding in an expansive opinion delivered on Circuit. *United States v. Cruikshank,* 25 F.Cas. 707 (No. 14,897) (C.C.D.La. 1874), *aff'd,* 92 U.S. 542, 23 L.Ed. 588 (1875) (the Supreme Court did not consider the scope of the Thirteenth Amendment). Under the Bradley analysis, the Thirteenth Amendment gave Congress the power to secure equality under the law for all races, Buchanan, *The Quest for Freedom: A Legal History of the Thirteenth Amendment (Chapter III),* 12 Houston L.Rev. 357, 360 (1975) ("Buchanan: Chapter III"), thus dramatically altering the power relationship between the states and the federal government. *See* ten Broek, *Thirteenth Amendment to the Constitution of the United States,* 39 Calif.L.Rev. 171 (1951).

#### 2. Post-Reconstruction Era Evaluation by the Supreme Court

However, the Supreme Court soon began to render decisions which veered from the direction of the legislative mandate towards an attitude of restricting federal protection of civil rights. *See Blyew v. United States,* 80 U.S. 581, 13 Wall. 581, 20 L.Ed. 638 (1871); *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873); *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883); *The Civil*

---

12. Professor Buchanan has compiled a thorough and excellent history of the Thirteenth Amendment, Congressional authority under the Thirteenth Amendment, the design and intent of the 1866 Civil Rights Act, and the judicial evaluation of both the Amendment and the Act since their inception in a multi-chaptered article which appears serially in Volume 12 of the Houston Law Review.

*Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); *cf.* Note, *The "New" Thirteenth Amendment: A Preliminary Analysis*, 82 Harv.L.Rev. 1294, 1303–07 (1969).[13]

### 3. *Hodges v. United States: Death Blow to the Amendment and the Act*

After 40 years, the Supreme Court culminated its evaluation of the legislation of that period by reducing the effect of the Thirteenth Amendment and its legislative offspring to a nullity. *Hodges v. United States*, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906); *see generally* Gressman, *The Unhappy History of Civil Rights Legislation*, 50 Mich.L.Rev. 1323 (1952).

The *Hodges* decision effectively eliminated the protection of § 1981 for anyone but members of the Negro race, 203 U.S. at 18, 27 S.Ct. 6, by narrowly applying the Thirteenth Amendment as authorizing Congress to pass legislation dealing solely with slavery and the protection of that class of persons who had previously been enslaved in the Southern United States prior to the Civil War. 203 U.S. at 19, 27 S.Ct. 6. The 1866 Civil Rights Act was characterized as merely a duplication of the Thirteenth Amendment. *Id.* The *Hodges* Court ruled in effect that § 1981 served only to free southern Negroes from bondage and expose them to the chances of citizenship to which all other citizens were exposed. 203 U.S. at 20, 27 S.Ct. 6.[14]

---

**13.** Several factors contributed to the Act's judicial emasculation. First, the supporters of the Act including Senator Trumbull had included the provision on citizenship in the Act because they were greatly disturbed with the Supreme Court's holding in 1857 that Negroes lacked citizenship. *See Dred Scott v. Sandford*, 19 How. 393, 15 L.Ed. 691 (1857). Subsequent courts would point to this concern to justify limiting the reach of the Act to black persons.

Second, so concerned was the Congress with the "citizenship" issue—i.e., the ease with which a subsequent Congress could take away the rights of citizenship just conferred by legislative enactment, *Afroyim v. Rusk*, 387 U.S. 253, 262, 87 S.Ct. 1660, 1665, 18 L.Ed.2d 757 (1967)—that it followed up its passage of the Act quickly with a proposal to ratify a fourteenth amendment in June, 1866 ("All persons born or naturalized in the United States . . are citizens of the United States.").

Thus, when civil rights legislation was being considered in 1870, the Congress decided to emphasize its support of all that had been established in 1866 by reenacting and re-codifying the 1866 statute as part of the 1870 Civil Rights Act. *See* § 16, Act of May 31, 1870, 16 Stat. 144. However, other sections of the 1870 Act were enacted pursuant to § 5 of the Fourteenth Amendment. This fact, taken together with the fact that the Amendment had been proposed for ratification in 1866 in close proximity to the enactment of the statute, caused confusion among the courts as to whether the 1866 Act had been re-enacted pursuant to Congress' power under this Amendment, or the Thirteenth Amendment. *See, e.g., Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431, 439 n. 11, 93 S.Ct. 1090, 35 L.Ed.2d 403

(1973); *Virginia v. Rives*, 100 U.S. 313, 25 L.Ed. 667 (1879).

Third, as Professor Buchanan has noted, the Supreme Court in the latter part of the Nineteenth Century was adjudicating the breadth and depth of the Thirteenth, Fourteenth and Fifteenth Amendments in an extremely "sensitive political climate". Buchanan: Chapter III, *supra*, 12 Houston L.Rev. at 357.

**14.** As the first Mr. Justice Harlan stated emphatically in dissent in *Hodges*, this characterization of the Act as duplicative of the Thirteenth Amendment completely ignored the wording of the Amendment and the intent of Congress in enacting legislation in the wake of its ratification. 203 U.S. at 35, 27 S.Ct. 6.

The Thirteenth Amendment severed the master-slave bond by self-execution, without the aid of or need for legislation. The additional clause of the Amendment authorizing legislation therefore had to contemplate more than the mere abolition of chattel slavery. Thus, the Thirty-Ninth Congress did not intend that the 1866 Civil Rights Act would merely duplicate the effect of the Thirteenth Amendment. Senator Trumbull and other members of the Senate Judiciary Committee had drafted the Act and also had participated in drawing up and proposing for ratification the Thirteenth Amendment one session earlier. The 1866 Congress was aware of the Amendment's intended impact and undoubtedly approved passage of the Act as one means by which it, through § 2, would interpret in the first instance the scope of the Amendment through "appropriate legislation" to amplify its meaning and intent. *Cf. Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

### C. Modern Interpretation of § 1981

#### 1. Jones v. Alfred H. Mayer Co.

The Supreme Court expressly overruled *Hodges v. United States* in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 441 n. 78, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), signaling a new era for the Thirteenth Amendment and the 1866 Civil Rights Act.[15] From a review of the legislative history, the Court ruled that the statute encompassed private as well as public discrimination, and that all racially motivated discrimination in the sale of property was prohibited by 42 U.S.C. § 1982. 392 U.S. at 421, 88 S.Ct. 2186. The statute was meant "to prohibit *all* racially motivated deprivations of the rights enumerated in the statute . . . ." 392 U.S. at 426, 88 S.Ct. at 2196 (original emphasis).

The *Jones* Court completed its analysis by concluding that the Congress in 1866 had approved a comprehensive statute forbidding all racial discrimination, 392 U.S. at 435, 88 S.Ct. 2186, with respect to the rights enumerated in § 1981 and § 1982. 392 U.S. at 436, 88 S.Ct. 2186. To the Court, both supporters and detractors of the 1866 Civil Rights Act saw in it the same potential breadth. 392 U.S. at 433, 88 S.Ct. 2186; *see* Part III.A., *supra*. *See generally* Annotation, *Validity, Construction and Application of Federal Civil Rights Statute Dealing With Property Rights of Citizens (42 U.S.C. § 1982)—Federal Cases*, 20 L.Ed.2d 1768 (1968).[16]

#### 2. The Status of White Citizens Under § 1981 Since Jones v. Mayer

##### a. Standing to Sue: Sullivan v. Little Hunting Park, Inc.

Congress' authority to legislate to enforce the Thirteenth Amendment has now been finally decided by *Jones v. Mayer*. Since *Jones*, white citizens have been granted standing to sue under § 1981 (or § 1982) in several recent cases on the theory that racial discrimination motivated by anti-black feeling but directed against whites should be actiona-

**15.** The *Jones v. Mayer* Court ruled that private discrimination on the basis of race in the purchase of real property was proscribed by 42 U.S.C. § 1982. The instant case raises an issue only under 42 U.S.C. § 1981. However, as is noted above, *see* note 4, *supra*, both §§ 1981 and 1982 are derived from the same section of the same original statute, § 1 of the 1866 Civil Rights Act, 14 Stat. 27. The Supreme Court has indicated that the modern versions should therefore be interpreted and applied in a parallel manner. *See, e.g., Johnson v. Railway Express Co.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 439 n. 11, 93 S.Ct. 1090, 35 L.Ed.2d 403; *cf. Jones v. Alfred H. Mayer Co., supra*, 392 U.S. at 441 n. 78, 88 S.Ct. 2186.

**16.** Two years before *Jones v. Mayer*, the Supreme Court had occasion to review the origins of the 1866 Civil Rights Act in *City of Greenwood v. Peacock*, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966); and *Georgia v. Rachel*, 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966). Both cases presented questions of the proper interpretation of civil rights removal statutes which began as § 3 of the 1866 Civil Rights Act, and are now codified as 28 U.S.C. § 1443. Section 1443(1), which was the subsection under scrutiny, permits removal of a criminal prosecution by a person against whom such action is pending who "is denied or cannot enforce in the courts of such State a *right under any law providing for the equal civil rights of citizens of the United States*, or of all persons within the jurisdiction thereof." 28 U.S.C. § 1443(1) (emphasis added).

Although the predecessor to § 1443(1) was separated from §§ 1 and 2 of the 1866 Civil Rights Act and codified under a separate section pertaining to jurisdiction and removal, the Court held that it continued to pertain to the rights enumerated under the 1866 Civil Rights Act, as well as the rights provided in subsequent Civil Rights Acts. *Georgia v. Rachel, supra*, 384 U.S. at 790–92, 86 S.Ct. 1783. The Court also concluded that the phrase "any law providing for . . . equal civil rights" must be construed to mean any law providing for specific civil rights stated in terms of racial equality. 384 U.S. at 792, 86 S.Ct. at 1790.

The Negro petitioners in *Rachel* were thus entitled to relief under § 1443(1) because their claims were couched in terms of denial of rights on the basis of racial equality. 384 U.S. at 804–05, 86 S.Ct. 1783. Augmenting their analysis of the availability of removal under § 1443, the Court in *Peacock*, the companion case to *Rachel* held that removal petitions could be filed not only by Negroes, but also by members of the Caucasian or any other race. 384 U.S. at 832 n. 31, 86 S.Ct. 1783.

ble. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306 (2d Cir. 1975); *Faraca v. Clements*, 506 F.2d 956 (5th Cir.), *cert. denied*, 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975); *WRMA Broadcasting Co. v. Hawthorne*, 365 F.Supp. 577 (M.D.Ala.1973); *Walker v. Pointer*, 304 F.Supp. 56 (N.D.Tex. 1969).[17] In the leading case, *Sullivan v. Little Hunting Park, Inc.*, a white citizen (Sullivan) was expelled for advocating to the executive board of his housing subdivision the right of a black person to purchase his house. The Supreme Court ruled that Sullivan had standing to sue to redress this variety of racial discrimination directed against him for his efforts to vindicate the enumerated rights of minorities which are protected by 42 U.S.C. § 1982.

### b. White Citizens Stating a Claim on Their Own Behalf

Cases like *Sullivan* permit white citizens to sue under § 1981 to proscribe this variety of racial discrimination. Full relief is made available to white complainants who suffer deprivation in the enjoyment of their enumerated rights as the result of racial "backlash". However, a

few courts have held that white citizens possess the ability to state a claim on their own behalf solely on the basis of an allegation of racially discriminatory treatment against them as whites. *Hollander v. Sears, Roebuck & Co.*, 392 F.Supp. 90 (D.Conn.1975); *Gannon v. Action*, 303 F.Supp. 1240, 1244 (E.D.Mo. 1969), *aff'd in part, remanded in part on other grounds*, 450 F.2d 1227 (8th Cir. 1971) (en banc); *see Kentucky v. Powers*, 139 F. 452 (C.C.E.D.Ky.1905); *cf. Baca v. Butz*, 394 F.Supp. 888, 890 n. 4 (D.N.M.1975).[18] Concluding that the statute was meant only to elevate blacks to a level of parity with whites, most courts have prohibited actions brought by white citizens by looking solely to the literal terms of § 1981. *See, e. g., Perkins v. Banster*, 190 F.Supp. 98, 99 (D.Md.), *aff'd per curiam*, 285 F.2d 426 (4th Cir. 1960).

### 3. The Case of McDonald v. Santa Fe Trail Transp. Co.

#### a. Introduction

This Court has previously ruled that § 1981 by its literal terms is "inapplicable to white citizens". *McDonald v. Santa Fe Trail Transp. Co.*, Civil Action No. 71–H–891 (S.D.Tex., May 2, 1974), *aff'd*

**17.** Section 1981 has been and is to be liberally construed, *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974), and the applicability of § 1981 has not been confined solely to "racial" discrimination. It is now settled that aliens have standing under § 1981. *Graham v. Richardson*, 403 U.S. 365, 377, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974). This Court has previously recognized that "national origin" discrimination is so closely related to racial discrimination as to be indistinguishable. *Godbolt v. Hughes Tool Co.*, 63 F.R.D. 370 (S.D.Tex.1972). It would make little difference in the instant context, for example, to compare treatment of the affected persons by race—e.g., white, black, Oriental—rather than by national origin—e.g., American white, American Negro, and Japanese or Japanese-American.

**18.** In *Walker v. Pointer* the plaintiffs were Caucasian tenants living in a Dallas apartment that they had rented for one year from the defendant landlord, also a Caucasian. With only brief notice, 304 F.Supp. at 57, the de-

fendant manager of the apartments had evicted plaintiffs ostensibly, according to plaintiffs, because of their association with black persons—i. e., they had entertained black friends at their apartment.

Responding to defendants' contention that the case should be dismissed because § 1982 was alleged not to protect white citizens, the court noted that white slavery had existed during antebellum days, 304 F.Supp. at 58, and concluded that white citizens were meant to be included within the statute's protected class of persons.

However, in resolving the controversy before it, the court limited its finding of jurisdiction. Focusing on the effects of black racial animus, the court stated that relief from such discrimination could not be restricted constitutionally to black victims but must also be available to white persons, like the *Walker* plaintiffs, who were victims of the discrimination. 304 F.Supp. at 60. Therefore, plaintiffs who were found to have been evicted because of their association with black persons were held entitled to sue under § 1982. 304 F.Supp. at 63.

*per curiam,* 513 F.2d 90 (5th Cir.), *cert. granted,* 423 U.S. 923, 96 S.Ct. 264, 46 L.Ed.2d 248 (1975). All that has been said by this Court to this point in the instant decision contradicts this prior holding. For that reason, and because *McDonald* has been cited by counsel in this case and presently awaits full review this Term by the United States Supreme Court, this Court herein feels compelled to review and re-state its position on that case.

### b. Nature of the Complaint in McDonald

In *McDonald,* a complaint was filed which on its face indicated that the plaintiffs, both of whom were white citizens, had been fired by their employer for stealing company property. Another employee, a black, was similarly charged by the employer, but he was not fired. The plaintiffs never alleged that they were falsely charged with misappropriating company property; they simply took the position that the black employee should also have been fired. Since the black employee was not fired, the white plaintiffs alleged that they were the victims of racial discrimination because of the employer's refusal to retain them in their jobs.

### c. This Court's Decision in McDonald Then and Now

This Court could find no allegation of racial discrimination on the face of the complaint. Instead, this Court could find only that the employer had fired the plaintiffs because they were guilty of theft, a circumstance which they did not deny in the complaint. The Court dismissed the Title VII claim for that reason.[19]

The absence of a race discrimination allegation on the face of the complaint also affected the § 1981 claim, and this Court could have dismissed the § 1981 claim for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). However, in reviewing the statutory language and the cases interpreting it, the Court became aware of the split of district court authorities on the question of the "standing" of Caucasians to bring suit on their own behalf under § 1981. Without precedent from the Courts of Appeals and the benefit of submission of the legislative history of the statute, this Court was persuaded by the statutory language rationale and followed the more numerous authorities holding that § 1981 was "inapplicable to white citizens".

Having reviewed the somewhat confusing development of the case law in this legal area as of 1974 and the thought processes employed by this Court at that time, it is quite apparent what precipitated the refusal to apply § 1981 to white citizens in *McDonald.* Only the appearance of *Hollander v. Sears, Roebuck & Co.,* 392 F.Supp. 90

---

**19.** In dismissing, however, this Court stated that "the dismissal of white employees charged with misappropriating company property while not dismissing a similarly charged Negro employee does not raise a claim upon which Title VII relief may be granted." *See* Order of the Court at 4, *McDonald v. Santa Fe Trail Transp. Co., supra.* This statement expressed this Court's narrow conclusion that *any* employee (white or black) fails to state a claim under 42 U.S.C. § 2000e–2(a)(1) when he alleges discrimination after having been fired concededly for stealing company property.

However, the defendant in the instant case suggests that on the basis of this statement, *McDonald* stands for the proposition that Title VII is not available to white citizens and that white citizens can have no cause of action under Title VII because they can never be the victims of discrimination on the basis of race, color or national origin.

This Court's decision in *McDonald* clearly should not support such a reading. The Court dismissed McDonald's Title VII claim solely because of the absence of an allegation of the commission of an unlawful employment practice on the basis of race discrimination. It was clearly not this Court's intention in *McDonald* to hold that Title VII is *per se* inapplicable to white persons. As is mentioned above, *see* note 3, *supra,* Title VII mandates that each employee, regardless of his race, color or national origin be evaluated in his employment solely on the basis of his own qualifications and not on the basis of a racial classification. Title VII therefore provides full remedies in appropriate cases for all employee-discriminatees, including whites.

(D.Conn.1975), with its review of the legislative history,[20] triggered this Court's reassessment of the issue in the instant case. As is now obvious from such review, the spirit and intent of § 1981, despite its literal terms, provide full remedies for all persons, including white citizens, for redress of the effects of proscribed racial discrimination.

This Court's repudiation of the principle enunciated as applicable to § 1981 in *McDonald* in no way changes the result in *McDonald*. The complaint does not really allege racial discrimination, and if this Court had circumvented the split in the case law and found jurisdiction, it still would have dismissed the § 1981 claim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The instant case has caused this Court once more to examine the legal area and in the light of interim case development and independent research to conclude that § 1981 is a much more broadly-based statute than what was first concluded.

### d. McDonald at the Appellate Level

This Court's dismissal of McDonald's § 1981 cause of action has been affirmed by the United States Court of Appeals for the Fifth Circuit. *McDonald v. Santa Fe Trail Transp. Co., supra,* 513 F.2d 90. In a brief paragraph at the beginning of its per curiam opinion, the Court of Appeals states: "The district court held that this section [§ 1981] confers no actionable rights upon white persons, and dismissed for lack of jurisdiction the § 1981 claim brought by the two white

plaintiffs. We affirm." *Id.* The appellate panel then went on to cite the existing cases which had held on both sides of the question. *Perkins v. Banster,* 190 F.Supp. 98 (D.Md.), *aff'd per curiam,* 285 F.2d 426 (4th Cir. 1960); *Van Hoomissen v. Xerox Corp.,* 368 F.Supp. 829 (N.D. Cal.1973); *Ripp v. Dobbs Houses, Inc.,* 366 F.Supp. 205 (N.D.Ala.1973); (no cause of action for whites). *Contra, WRMA Broadcasting Co. v. Hawthorne, supra; Gannon v. Action, supra;* (cause of action for whites).

The *McDonald* ruling runs counter to this Court's conclusion herein that these white plaintiffs may state a claim under § 1981 by alleging racial discrimination against them as Caucasians. In an ordinary case, this Court would feel compelled to follow the law as pronounced by the Fifth Circuit Court of Appeals. But this is not an ordinary case. It is only too apparent that the legislative history of § 1981 mandates a reassessment of this Court's *McDonald* holding, in which legal reasoning was employed and advanced without benefit of the statute's legislative history in ruling upon a motion to dismiss. The Fifth Circuit's ruling affirming *McDonald* was similarly based on such an evaluation.

As explicated heretofore, the scope and the application of § 1981 were inaccurately drawn when this Court restricted that statute to non-white citizens on the *McDonald* facts. Inasmuch as the Supreme Court has recently granted certiorari in *McDonald, see* 423 U.S. 973, 96 S.Ct. 264, 46 L.Ed.2d 248, it is felt that

---

**20.** Arguably, *Hollander* is distinguishable from the instant case on its facts in that it goes further in applying § 1981 to white citizens than does this Court. *Hollander,* a Caucasian, was a student whose application for summer employment was rejected by the defendant because of its ostensible attempt to hire only persons who belonged to non-white racial groups for its part-time employment program. The holding of the *Hollander* court is that evaluation and exclusion on a racial basis is not permitted under § 1981.

That court's reading of the legislative history of § 1981 and its applicability to white citizens coincides with that which this Court derives from the proceedings of the Thirty-Ninth Con-

gress. However, the *Hollander* court's holding of judicial power to proscribe racial discrimination is more broadly applied than that advanced here by this Court. *Hollander* ostensibly was discriminated against because he was white, and the prospective employer was seeking affirmatively to promote "minority recruitment". The holding in *Hollander* could conceivably be construed to curb the ability of employers (or other institutions subject to the proscriptions of § 1981) to achieve racial balance via an affirmative action quota system. Such affirmative action is not challenged in this case. Only the question of invidious reverse discrimination is presented. *See* note 1, supra.

this Court's action in that case should be clarified and that the parties in the instant case should be fully apprised of all factors which lead the Court to reach its current conclusion as to the proper interpretation of § 1981.

## V. WHITE CITIZENS' STANDING IN THE INSTANT CASE

■ The three named plaintiffs in this suit are white American citizens of non-Japanese national origin. They allege that they represent a class composed of those persons who have been, are now, or might be employed by defendant at any of its American offices in non-secretarial positions, and who are not members of the Oriental race or of Japanese national origin.

Defendant's motion to dismiss for lack of standing under § 1981 is denied. The named plaintiffs have standing to sue under § 1981 as well as Title VII to vindicate the rights of purported members of this class of non-Japanese persons who are also non-white citizens. *Sullivan v. Little Hunting Park, Inc., supra*; *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917); *Faraca v. Clements, supra.*

## VI. THE INSTANT WHITE CITIZEN'S CLAIM BASED ON RACIAL DISCRIMINATION AGAINST CAUCASIANS

Defendant's motion to dismiss for failure to state a claim pursuant to Fed.R. Civ.P. 12(b)(6) is denied. In the section of the complaint which alleges discrimination against whites because of their race, the complaint states a claim upon which relief can be granted under § 1981 as well as Title VII. The § 1981 phrase "as is enjoyed by white citizens" does not detract from such an application of § 1981. The Court reaches this conclusion after having evaluated the legislative history, the wording and analysis of the decisions of the United States Supreme Court and the Courts of Appeals, and the evolution of § 1981.

## VII. CONCLUSION

The legislative travail to grapple with the consequences of the peace after April 9, 1865, caused the Congress to ratify a thirteenth alteration to the Constitution and to produce in 1866 a tool forged to re-define the status of American citizens and protect from racial discrimination certain enumerated rights of all persons, regardless of race or color. The statute thus enacted serves to eradicate all racial discrimination in the enumerated rights, rather than merely elevate, non-white citizens above white citizens to a privileged legal status because of race.

The cutting edge of the 1866 Civil Rights Act is protection against discrimination on the basis of race, not protection against discrimination by numerical majorities. The phrase "as is enjoyed by white citizens" was a superfluity to the members of the Thirty-Ninth Congress. If the phrase is not a superfluity, it merely reflects Congress' intention to equalize all races before the laws of the United States. Given the expungement of old values which that Congress saw as being brought about by the military result of the Civil War, the legislators sought to ensure that treatment of all races after April 9, 1866, would be equivalent to the level attained before the Civil War only by white citizens.

Alternatively, the subject phrase is properly viewed as establishing a barometer of legal protection in 1866, when white citizens enjoyed a numerical majority and superior *de jure* legal protection. For the Congress to express its ideal in terms of what the most highly-protected citizens of that time enjoyed does not embed permanently that class as the standard-bearer, nor deprive that class of their rights under the law when the facts of the case raise the issue.

Times have changed. Under certain circumstances today, such as those in the instant case, a non-white racial group can enjoy a superior numerical, political or economic position. *See* note 8, *supra*. Regardless of the vagaries of shifting

demographic or economic patterns or evolving societal attitudes and tolerances, § 1981 anchors legal protection for the members of all races.

■ Thus, the instant plaintiffs have standing and state claims upon which relief can be granted. Persons of Japanese ancestry, whether American citizens or not, receive the full benefits and protections of § 1981. *Oyama v. California*, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948). White citizens are to be accorded the same legal protection in Courts of the United States.