**JAMES L. SAPHIER AGENCY, INC., Plaintiff-Appellant,**

v.

**Jules L. GREEN, Defendant-Appellee.**

**No. 345, Docket 26735.**

United States Court of Appeals Second Circuit.

Argued April 20, 1961.

Decided Aug. 28, 1961.

Emil K. Ellis, New York City (Michael Halperin, Solomon Granett, Maurice Shire; Halperin, Morris, Granett & Cowan, New York City, on the brief), for plaintiff-appellant.

Myron J. Greene, New York City (Irving Cohen, David Grossberg; Reinheimer & Cohen, New York City, on the brief), for defendant-appellee.

Before WATERMAN, MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge.

Plaintiff, James L. Saphier Agency, Inc. (Saphier), appeals from a dismissal of its complaint on the merits at the close of plaintiff's case in an action against defendant, Jules L. Green (Green), to recover commissions.

The dispute arose out of a number of complex arrangements involving Steve Allen, a well-known entertainer; Saphier, a theatrical booking agency, having its principal office in California; and Green, a former employee of Saphier and since May, 1953, the agent, personal representative and manager of Allen.

In 1949, Green, who became an employee of Saphier in 1947, brought Allen into that agency. Thereafter, Green was assigned to take charge of the management of Allen, and in 1950 when Allen's activities were conducted from New York, Green was placed in charge of Saphier's New York office where he continued to handle Allen's engagements. As of May 1, 1952, in continuation of their relationship, Allen and Saphier entered into three written contracts (Saphier contracts), which provided that Saphier would represent Allen for a term of three years in the fields of television, radio, and all other branches of the entertainment industry. The television contract (Saphier Television contract), the only one of the three directly involved in this action, specified that Allen was to pay Saphier 10 per cent of his gross income from television earned during the term of the contract; that these commissions were to be paid after the termination of the agency agreement on all contracts of employment entered into or negotiated during the term of the agency agreement and upon modifications, re-

newals, and extensions thereof; and that if any contract of employment was entered into within 120 days after the expiration or termination of any agreement with the same company or sponsor, it was to be deemed an extension or substitute for the original contract.

In April, 1953, Saphier's president, believing that Green was concentrating too much of his time on Allen, came to New York for the purpose of recalling Green to California and replacing him in the New York office. Not wishing to leave New York, Green, on May 13, 1953, resigned from the Saphier Agency. At about the same time Allen notified Saphier that he would like Green to become his full-time personal manager, and accordingly desired to be released from the Saphier contracts. An obstacle to such an arrangement, however, was the existence of a restrictive covenant contained in the employment contract between Green and Saphier which prohibited Green from soliciting Saphier's clients for two years after the expiration of the employment contract. A series of discussions and negotiations were thereupon entered into which resulted in an agreement signed by Allen, Green and Saphier (Tripartite Agreement) dated May 30, 1953, but actually executed November 3, 1953.

In brief, the Tripartite agreement recognized that the Saphier contracts were in full force and effect, under which "Saphier woud be entitled to commissions, as therein provided, but for the execution of this agreement"; and that Green and Allen were "[c]oncurrently herewith * * * entering into agency contracts * * * [Green contracts] including the fields covered by, and for commissions at least equal to those provided for in, the Saphier contracts, and for terms at least as long as the unexpired portion of the terms of the Saphier contracts." The contract provided that the effective period of the Green contracts be "defined as the period commencing on May 30, 1953 to and including May 29, 1955, plus the period thereafter during which Saphier would be entitled to commissions

under the Saphier contracts according to their terms"; and that "Allen, during 'the effective period of the Green contracts' * * * will pay commissions required to be paid by him by the Saphier contracts, according to their terms, as follows: * * * 65% to Green and 35% to Saphier."

Pursuant to this agreement, Allen paid Saphier the required 35 per cent of the agency 10 per cent (i. e., 3½%) commission on income received during the base three-year period of the underlying Saphier contracts and, although this three-year period ended on May 1, 1955, Saphier received his share of commissions from certain NBC Television contracts up to September 27, 1955, since these contracts were entered into during the three-year period. On that date, however, the NBC contracts with Allen expired and new contracts, dated September 26, 1955, were executed. As noted earlier, the Saphier Television contract contained an automatic extension clause and the Tripartite Agreement required Allen to pay Saphier a 3½% commission for as long a period as a commission would be payable according to the "terms" of the Saphier contracts. Claiming that the automatic extension clause as written presumably would cover the new NBC contracts, Saphier asserted that it was entitled to commissions thereon and, when these were not paid, commenced an arbitration proceeding against Allen and Green.

Allen defended by relying upon Rule 12–B of the American Federation of Television and Radio Artists (AFTRA). Since Allen was a member of AFTRA and Saphier was a franchised agent thereof, all contracts between them were subject to AFTRA rules and regulations. On July 23, 1953, prior to the actual execution of the Tripartite agreement, AF TRA adopted Rule 12–B which was applicable to new agency contracts with AFTRA members, and modified all unexpired contracts. The provision of this rule pertinent here in effect invalidates clauses in agency contracts requiring the payment of commissions after the ex-

piration of the agency contract on renewals, extensions, replacements or substitutions of employment agreements entered into during the term of the agency contract (or within 120 days thereafter) unless such renewals, extensions, replacements or substitutions were made pursuant to options in favor of the employer contained in the employment agreement. As the trial judge noted, the "unfairness" of an automatic extension clause such as that found in the Saphier Television contract "is apparent," and Rule 12–B was adopted to prevent situations where "[t]he entertainer may find himself tied forever to a sort of serfdom, and end up paying two full commissions, or perhaps more than that to as many different agents."

The arbitrators ruled that the Tripartite agreement, "insofar as it relates to the relationship between Saphier and Allen" is an "agency contract" and that, therefore, all the provisions of Rule 12–B were imported into the Tripartite agreement and into the underlying Saphier contracts to which it related. Because the new NBC contracts "concededly did not result from the exercise of any option contained" in the earlier NBC contracts, the arbitrators concluded that Rule 12–B precluded Saphier from recovering commissions from Allen on the new agreements. As to the controversy between Green and Saphier, however, they noted that this involved a dispute between two agents rather than an agent and an AFTRA, member, and that for this reason Rule 12–B, including the compulsory arbitration provision thereof, was inapplicable. Accordingly, the arbitrators held that this dispute was not arbitrable; that they were without jurisdiction to make an award; and that they were "leaving these parties to seek their remedies in an appropriate forum, * * * without prejudice and without intimating any views as to the merits." The award was confirmed by the Supreme Court of the State of New York, August 11, 1958.

Saphier thereupon brought this action against Green. In order to avoid the effect of Rule 12–B, Saphier now contends that under the Tripartite agreement Allen undertook to pay Green a 10 per cent commission (not 3½% to Saphier, 6½% to Green) who, in turn, agreed to pay Saphier 3½% thereof. According to Saphier, the duration of Allen's obligation to Green and Green's obligation to Saphier would not be subject to Rule 12–B, because Green is not a "franchised agent" but only a "personal manager" and, hence, not bound by AFTRA rules in his dealings with Allen, and because contracts between a "personal manager" and a "franchised agent" are similarly not affected by such rules. Thus, Saphier concludes that the duration of these obligations would be measured by the Saphier contracts as written including the automatic extension provisions contained in the Saphier Television contract.

At the trial below, the court dismissed the complaint on the grounds that the issues "were fully litigated in the arbitration proceedings and decided against plaintiff on the merits"; that there was thus a prior adjudication of these issues; that "plaintiff is collaterally estopped from maintaining this action"; and, in the alternative, that there was no obligation on the part of Green to pay anything to Saphier.

■ There is no doubt that in the arbitration proceeding the issues between Saphier and Allen embraced the effect of the Tripartite agreement; the May 1952 agency agreement between Saphier and Allen; Allen's breach, if any, of either agreement; and Saphier's right to recover against Allen any commissions arising out of Allen's NBC contracts. These issues were decided adversely to Saphier. However, they were not decided at all as between Saphier and against Green. It is essential to the defense of *res judicata* that a final adjudication on the merits has previously disposed of the claim. Restatement, Judgments, § 49 (1942); Israel v. Wood Dolson Co., 1956, 1 N.Y.2d 116, 151 N.Y. S.2d 1; Good Health Dairy Products Corp. of Rochester v. Emery, 1937, 275 N.Y. 14, 9 N.E.2d 758, 112 A.L.R. 401.

In the arbitration proceeding, the arbitrators specifically declared that the dispute between Green and Saphier involved "different considerations" as to which they expressed no views on the merits. The ultimate issue in the arbitration concerned Allen's obligation to Saphier, and the conclusion that this obligation had been fully satisfied was based on the prohibitions of Rule 12–B. If Saphier thereafter had commenced this action on the ground that Green was secondarily liable for Allen's failure to pay commissions, there would have been considerable merit to the *res judicata* defense. See Israel v. Wood Dolson Co., supra. Saphier, however, is claiming, not that Green was paid commissions by Allen which Allen was obligated to pay Saphier, but that the Tripartite agreement obligated Green to pay Saphier 3½% of the commissions he received from Allen. This claim is based on a theory quite different from that asserted unsuccessfully against Allen. Nor would the arbitrator's holding that the limitations of Rule 12–B were imported into the Tripartite agreement be conclusive as to the duration of Green's supposed obligation to Saphier, since the arbitrator's opinion is clear to the effect that this conclusion related only to the relationship between Allen and Green. Thus the decision below cannot be sustained on the grounds of *res judicata*. Nor is it sustainable on the grounds of collateral estoppel.

■■ The doctrine of collateral estoppel is applicable only where the second suit embraces a different cause of action than that adjudicated in the prior suit. In such a situation the parties are "collaterally estopped" from relitigating any issue which was actually litigated and decided in the previous action. Schuylkill Fuel Corp. v. B. & C. Nieberg Realty Corp., 1929, 250 N.Y. 304, 165 N.E. 456. Collateral estoppel does not properly apply in the present case, for the second cause of action in which Saphier claimed commissions to be due and owing it from Green is identical to the action which it brought before the arbitrators and over which the arbitrators refused to take jurisdiction.

The merits of the dispute between Saphier and Green must be determined from their written agreements entered into at a time when they were mindful both of their problems and their differences. Because of Allen's preference for Green's services, the managerial relationship between Saphier and Allen was over. It was but natural that Saphier should try to hold on to the remnant of his contractural rights as best it could even though it would not be rendering future services. Quite apart from the possible effect of AFTRA's Rule 12–B a remnant should not be turned into a perpetuity absent the strongest expressions of such a desire. Saphier's disappointment after Allen's vogue and success had by television alchemy transformed dollars into thousands is easily understandable. However, Saphier must share its disappointment with countless others who have in the early stages nurtured future stars but it cannot share dollars with Green under any plausible construction of the written agreements.

■ As the trial judge held, the Tripartite agreement obligated Allen and not Green to pay commissions to Saphier. Nowhere in this agreement is there any language requiring Green to make payments to Saphier. On the other hand, it is replete with references to Allen's obligation to Saphier. For example, paragraph 2 states that Allen "will pay commissions required to be paid by him by the Saphier contracts * * * as follows: * * * 35% to Saphier * *"; paragraph 5 refers to Allen's obligation to pay commissions "to both Saphier and Green"; paragraph 6 recites that "Allen agrees to pay Saphier the commission due him under paragraph 2 hereof at the same time that such payments would have been due to Saphier * * * under the Saphier contracts" and that Saphier "accepts the commissions specified under paragraph 2 hereof as full and complete payment by Allen to Saphier of commissions under the Saphier contracts";

paragraph 7 permits Saphier to assign any commissions, "on condition that he notifies Allen in writing of such assignment"; and paragraph 4 recites that during the period that the Saphier contracts are suspended, "Allen is released by Saphier as to all commissions * * * except to the extent required to be paid by Saphier under paragraph 2 * * *" These provisions, read together with the rest of the agreement make it clear that the parties intended that Allen's obligations to Saphier would continue as required by the Saphier contracts, but that in return for the suspension of Saphier's entire obligation to Allen, they would be reduced to the amounts specified in paragraph 2 of the Tripartite agreement. In effect then, this agreement modified Allen's pre-existing obligation to Saphier, and did not, as contended by Saphier, replace this with an entirely new obligation running from Green to Saphier.

Saphier argues that the "most significant and most revealing sentence in the entire contract" is that "Allen's obligations to Green under the Green contracts are reduced to the extent Allen is required hereunder to pay commissions to Saphier." This, argues Saphier, is "clear recognition" that Allen had agreed to pay 10 per cent to Green, that Green had agreed to pay 3½% thereof to Saphier, and that Green was instructing Allen to fulfill Green's obligation to Saphier by paying 3½% directly to Saphier. But this sentence is equally "clear recognition" of nothing more than that Allen had agreed to split the commission he was paying and that he wanted to insure that at no time would he be required to pay more than an aggregate 10%.

Finally, Saphier contends that the Tripartite agreement is ambiguous and susceptible to different interpretations and that because the trial judge received parol evidence as to its meaning, this issue should have been submitted to the jury. This argument must fail, however, because the Tripartite agreement, at least insofar as it concerns Green's supposed obligation to Saphier, is reasonably

susceptible to only one interpretation and remains so even after it is viewed in the light of the rather inconclusive parol evidence introduced by Saphier. The law for generations has differentiated between construction and ambiguity. Difficult though construction may be, the courts cannot and should not shift this burden to a jury by straining to find nonexistent ambiguity.

The causes of action based on fraud, unjust enrichment, and misuse of confidential information are unsupported by the evidence and were thus properly dismissed.

Affirmed.