**Alan Roy HOLLANDER**

v.

**SEARS, ROEBUCK & CO.**

**Civ. No. H-74-398.**

United States District Court,
D. Connecticut.

March 27, 1975.

---

Alan Roy Hollander, pro se.

William S. Rogers, Louis R. Pepe, Hartford, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION TO DISMISS

BLUMENFELD, District Judge.

This is a pro se action brought pursuant to 42 U.S.C. § 1981 (1970) by the plaintiff, a white student at Wesleyan University in Middletown, Connecticut, who alleges that he was subjected to racial discrimination by the defendant, Sears, Roebuck & Co., as a result of its refusal to consider him for a position in the Sears Summer Internship Program for Minority Students. The defendant has moved to dismiss the action on three distinct grounds.

The complaint alleges that on December 7, 1973 the defendant conducted recruiting interviews for its summer internship program at Wesleyan University, but denied the plaintiff such an interview solely because he was white and not a member of a minority group. Following this refusal, the plaintiff on December 11, 1973 sent letters of complaint to both the Connecticut Commission on Human Rights and Opportunities (hereinafter "Commission") and the United States Equal Employment Opportunity Commission (hereinafter "EEOC") in Boston, Massachusetts. The Connecticut Commission investigated the complaint and on June 19, 1974 dismissed it without a hearing on the basis of insufficient evidence of racial discrimination. On July 16, 1974 the plaintiff appealed the Commission's decision to the Court of Common Pleas in Hartford, but on November 20 that court sustained a plea in abatement [1] and the action was dismissed. The complaint before the EEOC was withdrawn by the plaintiff on January 13, 1975, only six days following his receipt of that commission's notification of readiness to investigate the complaint. The instant action was filed on December 20, 1974 and alleges a violation of 42 U.S.C. § 1981 (1970).[2] Jurisdiction is grounded in 28 U.S.C. § 1343(4) (1970).

### I.

The defendant's principal claim is that § 1981 does not provide a cause of action for whites who are the alleged victims of racial discrimination. While there is some support for this broad claim, see Ripp v. Dobbs Houses, Inc., 366 F.Supp. 205 (N.D.Ala.1973); Balc v. United Steelworkers of America, 6 Employment Practices Decisions ¶ 8948 (W.D.Pa. 1973), aff'd without opinion, 503 F.2d 1398 (3d Cir. 1974); Perkins v. Banster, 190 F.Supp. 98 (D.Md.1960), aff'd,

---

1. The plea was based upon untimely and improper service upon the defendant in that action.

2. 42 U.S.C. § 1981 (1970) provides:

    "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

285 F.2d 426 (4th Cir. 1960), I do not agree with it.

It is true that the statute provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . *as is enjoyed by white citizens* . . . ." (emphasis added), but I do not understand this to mean, as the defendant maintains, that only non-whites may sue under § 1981. A review of the relevant legislative history of § 1 of the Civil Rights Act of 1866, 14 Stat. 27[3] from which § 1981 was ultimately derived provides strong support for the position that the phrase— "as is enjoyed by white citizens"—was not intended to restrict the availability of this cause of action to non-whites.[4]

As originally passed by the Senate, the bill which eventually became § 1 of the 1866 Act did not contain the questioned phrase. It was added by amendment in the House. *See* Georgia v. Rachel, 384 U.S. 780, 791, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966). During the Senate debates on that original bill, Senator Lyman Trumbull of Illinois, the floor manager, made it quite explicit that the bill was intended to protect the rights of whites, as well as blacks. In response to a charge by one of the bill's opponents that it was outrageous to provide federal protection for blacks that had never been accorded whites, Senator Trumbull stated:

"Sir, this bill applies to white men as well as black men. It declares that all persons in the United States shall be entitled to the same civil rights, the right to the fruit of their own labor, the right to make contracts, the right to buy and sell, and enjoy liberty and happiness; and that is abominable and iniquitous and unconstitutional! Could anything be more monstrous or more abominable than for a member of the Senate to rise in his place and denounce with such epithets as these a bill, the only object of which is to secure equal rights to all the citizens of the coun-

---

3. Act of April 9, 1866, c. 31, § 1, 14 Stat. 27, re-enacted by § 16 of the Enforcement Act of 1870, Act of May 31, 1870, c. 114, § 16, 16 Stat. 140, 144, and codified in §§ 1977 and 1978 of the Revised Statutes of 1874, now 42 U.S.C. §§ 1981 and 1982.

Section 1 provided in relevant part:

"[A]ll . . . citizens of the United States . . . of every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

4. Although the defendant only asserts that § 1981 was not intended to provide whites with a cause of action, it might be argued that Congress lacked the power under the thirteenth amendment, which § 1981 in its original form was enacted to implement, *see* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), to pass protective legislation for whites. However, the colorblind nature of the thirteenth amendment was well discussed in Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex.1969), a case considering the availability of § 1982, *see* note 3 *supra*, to white litigants:

"The discussion of the Court in *Jones* indicates that the institution of slavery prompting the Thirteenth Amendment was ordinarily associated with the black man. Yet whites too have historically been susceptible to enslavement in many countries throughout the centuries. In this country white slavery was known to exist during the antebellum period in the South. Current statutes punishing practices relating to slavery continually refer to the victimization of 'any person.' 18 U.S.C. §§ 1581–1588. The bar against involuntary servitude has been invoked by the courts in numerous contexts where race is immaterial." *Id.* at 58 (footnotes omitted).

*See* WRMA Broadcasting Co. v. Hawthorne, 365 F.Supp. 577 (M.D.Ala.1973). As Congress clearly has the power to protect whites from involuntary servitude and slavery, there can be little doubt that it also has the power to protect whites from "all badges and incidents of slavery." Jones v. Alfred H. Mayer Co., *supra* 392 U.S. at 439, 88 S.Ct. at 2203.

try, a bill that protects a white man just as much as a black man? With what consistency and with what face can a Senator in his place here say to the Senate and the country that this is a bill for the benefit of black men exclusively when there is no such distinction in it, and when the very object of the bill is to break down all discrimination between black men and white men?" Cong.Globe, 39th Cong., 1st Sess. 599 (1866).

Of course, this statement was made before the House amended the bill to include, *inter alia*, the phrase "as is enjoyed by white citizens." However, when the bill was resubmitted to the Senate for consideration of the House amendments, the following colloquy took place between Senator Trumbull and Senator Van Winkle of West Virginia:

"Mr. VAN WINKLE. There seems to be an incongruity in this language to which I wish to call the attention of the chairman of the committee. The clause commences with the words 'and such citizens.' As I understand those words they include all persons who are or can be citizens, white persons and all others. The clause then goes on to provide that 'such citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, shall have the same right to make and enforce contracts,' &c., 'as is enjoyed by white citizens.' It seems to me these words are superfluous. The idea is that the rights of all persons shall be equal; and I think the clause, leaving out these words, would attain the object. This is merely a verbal criticism. I think the bill is incongruous in expression as it stands.

"Mr. TRUMBULL. I quite agree with the Senator from West Virginia that these words are superfluous. *I do not think they alter the bill.* I think the bill would be better without them, but they have been adopted by the House of Representatives. *We did not think they altered the meaning of the bill;* and we did not think it

worth while to send the bill back just because these words were inserted by the House. They thought there was some importance in them and have inserted them; and *as in the opinion of the committee which examined this matter they did not alter the meaning of the bill,* the committee thought proper to recommend a concurrence, and I hope the Senate will concur in it." (Emphasis added). Cong.Globe, 39th Cong., 1st Sess. 1413 (1866).

Without further debate, the amendment was approved by the Senate and ultimately the entire bill, as amended, was passed. Thus, the history of this legislation in the Senate clearly reflects an understanding that the act was to protect the rights of all citizens notwithstanding the amendatory language inserted by the House.

Nor is there anything in the debates in the House with regard to that phrase which would undercut the Senate's understanding. The phrase was added to the bill without debate on the floor of the House by motion of Congressman James F. Wilson of Iowa, the bill's floor manager. Cong.Globe, 39th Cong., 1st Sess. 1115 (1866). Although Congressman Wilson provided little explanation for his amendment, his subsequent remarks in the course of general debate provide support for the view that the language was not intended to restrict the bill's coverage to non-whites alone:

"Mr. Speaker, if all our citizens were of one race and one color we would be relieved of most of the difficulties which surround us. This bill would be almost, if not entirely, unnecessary, and if the States, seeing that we have citizens of different races and colors, would but shut their eyes to these differences and legislate, so far at least as regards civil rights and immunities, as though all citizens were of one race and color, our troubles as a nation would be well-nigh over. But such is not the case, and *we must do as best we can to protect our citizens,* from the highest to the lowest, *from the whitest to the black-*

*est, in the enjoyment of the great fundamental rights which belong to all men."* (Emphasis added). Cong. Globe, 39th Cong., 1st Sess. 1118 (1866).

■ In light, then, of this legislative history, it is quite clear that § 1981 should not be read as only providing a cause of action for non-whites. The phrase— "as is enjoyed by white citizens"—was apparently intended only "to emphasize the racial character of the rights being protected," Georgia v. Rachel, *supra,* 384 U.S. at 791, 86 S.Ct. at 1789, and not to impose a limitation upon the scope of the protection afforded by § 1981 to "all persons within the jurisdiction of the United States." 42 U.S.C. § 1981. Although the rights enjoyed by whites are used as the measuring stick under § 1981, whites themselves may be denied the rights which are normally available to members of their race. When that occurs, within the scope of activities protected by § 1981, and it is a result of racial discrimination, § 1981 provides them with a cause of action. *See* WRMA Broadcasting Co. v. Hawthorne, *supra;* Gannon v. Action, 303 F.Supp. 1240 (E.D.Mo.1969), aff'd in part, remanded in part on other grounds, 450 F.2d 1227 (8th Cir. 1971); Central Presbyterian Church v. Black Liberation Front, 303 F.Supp. 894 (E.D.Mo.1969); *cf.* Walker v. Pointer, *supra.*[5] And to read § 1981 in this way

complies with the well-known and wise rule of statutory construction enunciated by Judge Learned Hand in Federal Deposit Ins. Corp. v. Tremaine, 133 F.2d 827, 830 (2d Cir. 1943):

> "There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it."

## II.

■ The remaining grounds of the defendant's motion have little merit. The defendant maintains that before commencing this action under § 1981 the plaintiff was required to exhaust his administrative remedies before the EEOC. *See* 42 U.S.C. § 2000e–5 (1970). This argument was considered and definitively rejected by the Second Circuit in Gresham v. Chambers, 501 F.2d 687, 690–691 (1974).

Lastly, the defendant argues that the decisions of the Connecticut Commission and the Court of Common Pleas preclude further litigation of this issue under the doctrines of res judicata and collateral estoppel. Whether employment discrimination proceedings in these state forums can ever bar relitigation in federal court of a discrimination claim under § 1981 need not be decided here.[6] It is

---

5. The position that § 1981 protects all persons who are the victims of racial discrimination is implicitly supported by a number of cases which have held that whites who allege nonracially motivated discrimination do not have standing under § 1981, because "[t]he plain purpose of [the statute] is to provide for equality of rights as between persons of different races." Agnew v. City of Compton, 239 F.2d 226, 230 (9th Cir. 1956), cert. denied, 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (1957); *see* Van Hoomissen v. Xerox Corp., 368 F.Supp. 829 (N.D.Cal.1973); Willis v. Chicago Extruded Metals Co., 358 F.Supp. 848 (N.D.Ill.1973); Abshire v. Chicago and Eastern Ill. R.R. Co., 352 F.Supp. 601 (N.D.Ill.1972); Marshall v. Plumbers Local 60, 343 F.Supp. 70 (E.D.La.1972).

However, it has also become clear that § 1981 provides a cause of action for persons discriminated against on the basis of alienage. *See* Graham v. Richardson, 403 U.S. 365, 377, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Takahashi v. Fish and Game Comm'n, 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); Guerra v. Manchester Terminal Corp., 498 F.2d 641, 653–654 (5th Cir. 1974).

6. A series of cases have held that state adjudications do not preclude subsequent actions brought pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq. *See, e.g.,* Batiste v. Furnco Construction Corp., 503 F.2d 447 (7th Cir. 1974); Voutsis v. Union Carbide Corp., 452 F.2d 889 (2d Cir. 1971), cert. denied, 406 U.S. 918, 92 S.

clear that the nature of the state proceedings were such that neither res judicata nor collateral estoppel have any application to the instant case.

■ Administrative determinations may be given res judicata effect "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate . . . ." United States v. Utah Construction & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). However, it is clear that this is only true where "both parties had a full and fair opportunity to argue their version of the facts and an opportunity to seek court review of any adverse findings." *Id.; see* Paramount Transport Systems v. Chauffeurs Local 150, 436 F.2d 1064 (9th Cir. 1971); United Engineers & Constructors, Inc. v. International Bⱨd. of Teamsters, 363 F.Supp. 845 (D.N.J. 1973); International Wire v. Electrical Workers Local 38, 357 F.Supp. 1018 (N. D.Ohio 1972), aff'd, 475 F.2d 1078 (6th Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); Shell Chemical Co. v. Teamster Local 676, 353 F. Supp. 480 (D.N.J.1973). In the instant case that standard has not been satisfied. An investigator of the Connecticut Commission in accordance with Conn.Gen.Stat.Ann. § 31–127 (Supp. 1975) undertook an investigation of the plaintiff's charges, unilaterally determined that they lacked evidentiary support and dismissed them. No hearing was conducted and the plaintiff was not otherwise given an opportunity to argue his version of the facts. Under those circumstances, the Commission's determination cannot be given res judicata or collateral estoppel effect. *See also* James L. Saphier Agency, Inc. v. Green, 293 F.2d 769, 773 (2d Cir. 1961).

Nor can any such effect be given to the action taken by the Court of Common Pleas. That court's dismissal of the plaintiff's appeal was not a decision on the merits and thus does not constitute a bar to further litigation. Restatement of Judgments § 49 (1942). Furthermore, the failure of the plaintiff to appeal the court's dismissal to the Connecticut Supreme Court does not, as the defendant argues, bar this action. "[T]here is no doctrine of exhaustion of judicial remedies. If a judgment of dismissal is rendered on jurisdictional grounds, the losing party may accept it; and, instead of seeking a review, may institute another action where one will not be met by the jurisdictional bar." Illinois Cent. R. R. Co. v. Mississippi Pub. Serv. Comm'n, 135 F.Supp. 304, 306 (S.D.Miss.1955); Kipbea Baking Co. v. Strauss, 218 F.Supp. 696, 699 (E. D.N.Y.1963).

Accordingly, the defendant's motion to dismiss is denied, and it is

So ordered.

Ct. 1768, 32 L.Ed.2d 117 (1972). Several other courts have held that decisions of the National Labor Relations Board dealing with employment discrimination in the context of violations of the National Labor Relations Act are not to be accorded res judicata effect so as to prevent subsequent Title VII actions. *See* Willis v. Chicago Extruded Metals Co., *supra*; *cf.* Tipler v. E. I. duPont deNemours and Co., 443 F.2d 125 (6th Cir. 1971). Different factors, however, may be involved in deciding the issue with regard to § 1981 actions. *Cf.* Lombard v. Board of Educ., 502 F.2d 631 (2d Cir. 1974), cert. denied, —— U.S. ——, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975).