Alan Roy HOLLANDER

v.

SEARS, ROEBUCK & CO.

Civ. No. H–74–398.

United States District Court, D. Connecticut.

April 14, 1978.

Alan Roy Hollander, pro se.

William S. Rogers, Louis R. Pepe, Alcorn, Bakewell & Smith, Hartford, Conn., Robert F. Maxwell and Joseph M. Kehoe, Jr., St. Davids, Pa., of counsel, for defendant.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

In this pro se action Alan Roy Hollander, a white male, alleges that because of his race Sears, Roebuck & Co. excluded him from consideration for a position in its Summer Internship Program for Minority Students. In an earlier ruling on defendant's Motion to Dismiss, it was held that 42 U.S.C. § 1981 provided a cause of action for the plaintiff who alleged that he was the victim of racial discrimination. *Hollander v. Sears, Roebuck & Co.*, 392 F.Supp. 90 (D.Conn.1975). *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The case has now been submitted to the court for decision based on a stipulation of facts and a number of exhibits including correspondence, affidavits, a deposition of the plaintiff and other documents. Some of the facts included in the stipulation are as follows:

1. The defendant, Sears, Roebuck & Co., is a corporation organized and existing under the laws of the State of New York with an office and principal place of business in Chicago, Illinois.

2. At all times mentioned herein, Sears was and is a "federal contractor," as that term is used in certain Executive Orders and regulations.[1] Sears instituted an affirmative action program *on a national basis* in 1968.

3. Immediately prior to the summer of 1969, the Eastern Territorial Office of Sears adopted and implemented a Summer Internship Program.[2] The purpose of this program was to stimulate applicant flow from minority groups to Sears' regular management training programs and management positions. Although some participants in the Summer Internship Program were asked to join the regular Sears Management Training Program upon graduation from college, the program was a prerequisite neither to a regular management training program nor to permanent managerial employment with Sears.[3]

4. The Summer Internship Program was an eleven-week summer program for qualified college juniors. Admission to the program was restricted to minority students, defined to be Black, Oriental, Indian, or Spanish-surnamed persons. The program provided a weekly payment of $130 for participants.

5. No similar program was available to non-minority students while the Summer Internship Program was in existence. Other employment, both permanent and summer, was available at all such times on an equal basis to all persons regardless of race.

6. Plaintiff, Alan Roy Hollander, was a junior at Wesleyan University in Middle-

| Year | Interns | Offers | Acceptances |
|------|---------|--------|-------------|
| 1969 | 6 | 2 | 2 |
| 1970 | 12 | 6 | 1 |
| 1971 | 21 | 13 | 4 |
| 1972 | 35 | 19 | 6 |
| 1973 | 30 | 14 | 4 |
| 1974 | 36 | 19 | 18 |
| Totals | 140 | 73 | 35 |

From 1969 to 1974 inclusive, a total of 754 management trainees were employed by the Eastern Territory of Sears.

The Summer Internship Program was discontinued for the Eastern Territorial Office of Sears after the summer of 1975 because Sears' need for regular management trainees slackened significantly. Affidavit of Bruce A. Ward,

---

1. Executive Order No. 11246 was issued on September 24, 1965 (3 C.F.R. § 339 (1965)) and was amended by Executive Order No. 11478 (3 C.F.R. § 803 (1970)). The relevant regulations promulgated thereunder are Revised Order No. 4, as amended and supplemented by Revised Order No. 14.

2. The various geographical divisions of Sears were allowed to use their own discretion in implementing recruitment programs as those terms are used in 41 C.F.R. § 60–2.24(e)(7), (8) and (9) (1977).

3. The following is a history of the Summer Internship Program listing by years the total number of interns, the number of interns offered positions in the regular management training program, and the number of acceptances:

town, Connecticut, in December 1973,[4] when he attempted to register for an on-campus interview with the Personnel Manager of the Sears Connecticut Valley Group, W. E. Rittmeyer, who was then scheduled to recruit at Wesleyan for Sears' Summer Internship Program.

7. Sears refused to consider plaintiff for the Summer Internship Program for the sole reason that, as a white male, he was not a minority student as defined in paragraph 4 above.

8. On or about December 11, 1973, the plaintiff filed complaints with both the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission ("EEOC"), claiming that, by restricting admission to its Summer Internship Program to minority students, Sears had violated his rights under the Connecticut Fair Employment Practices Law, as amended, and Title VII of the 1964 Civil Rights Act, as amended.

9. On June 19, 1974, the CCHRO dismissed plaintiff's complaint for "lack of sufficient evidence" to support the charge. On July 16, 1974, plaintiff appealed that decision to the Connecticut Court of Common Pleas. The appeal was terminated on November 20, 1974, when that court sustained a plea in abatement filed by the defendant, the Chairman of the CCHRO.

10. Hollander did not appeal from the decision of the Court of Common Pleas, but, instead, on December 20, 1974, instituted the present action in this court. On January 13, 1975, plaintiff withdrew his complaint before the EEOC.

11. There is presently pending and being actively pursued against Sears a charge of systemic or class discrimination by Sears on a company-wide basis resulting in the denial of employment opportunities, including hiring, retention and promotion, to minorities, particularly blacks and females. That charge was filed by the then Chairman of the EEOC on September 11, 1973.

## I. *The Contract Right*

Title 42, Section 1981, which provides the basis for the present action, reads in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."[5] A decade ago, in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Court first considered whether purely private acts of racial discrimination in the sale of property violated § 1982, and held that the section reached discrimination by private owners as well as by public authorities.[6] Taking the lead foreshadowed in *Jones*, the lower federal courts applied its reasoning—principally in the area of employment—to hold that the companion provision § 1981 prohibited racial discrimination in the making of private contracts. *Macklin v. Spector Freight Systems, Inc.*, 156 U.S.App.D.C. 69, 478 F.2d 979 (1973); *Payne v. Ford Motor Co.*, 461 F.2d 1107 (8th Cir. 1972); *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377 (4th Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); *Young v. ITT*, 438 F.2d 757 (3d Cir. 1971); *Boudreaux v. Baton Rouge Marine Contracting Co.*, 437 F.2d 1011 (5th Cir. 1971); *Waters v. Wisconsin Steel Workers of International Harvester Co.*, 427 F.2d 476 (7th Cir.), *cert.*

---

Affirmative Action Director, dated March 31, 1977; Exhibit 5, p. 3.

4. He is now a law student at Boston College Law School.

5. The statute reads in full:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of per-sons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

6. Section 1982 reads:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

*denied,* 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). In *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Court adopted this view, stating that § 1981 affords a federal cause of action against racial discrimination in private employment.

Then in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Court declined to impose substantial constitutional limits on the statute's establishment of the right to make and enforce contracts. In *Runyon* the statute was held to prohibit defendants' refusals to admit black children whose parents sought to enter them in private schools. In holding that the statute prohibited a private racially motivated refusal to contract for their admission, the Court turned aside the schools' contention that the application of § 1981 violated the constitutionally protected rights of free association and privacy, or a parent's right to direct the education of his children. *Id.* at 175–79, 96 S.Ct. 2586.

In that case the defendants further argued that § 1981's "right to make a contract" demanded narrow construction. Over a strong dissent by Mr. Justice White, the Court ignored the defendant schools' argument that the right to "make and enforce contracts" did not impose on the offeror the reciprocal obligation not to refuse an acceptance on racially motivated grounds.[7] The *Runyon* majority chose not to engage in a strict analysis of defendants' asserted justification for refusal, but simply adopted the view as expressed by the Court of Appeals that "[t]he relationship the parents had sought to enter into with the schools was . . . undeniably contractual in nature, within the meaning of § 1981 . . . ." *Id.* at 166, 96 S.Ct. at 2592.

Finally in *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court interpreted § 1981 as creating an obligation not to discriminate against employment of whites upon the same standards as would be applicable to blacks. *Id.* at 280, 96 S.Ct. 2574.

Armed with the bar against discrimination solidly established by *Runyon* and *McDonald,* the plaintiff contends that even affirmative action programs which deny contractual opportunities through use of racial criteria violate § 1981.

■ As a defense to plaintiff's § 1981 claim, Sears argues that as a federal contractor, it was required by Executive Order 11246 and regulations promulgated by the Office of Federal Contract Compliance Programs ("OFCCP") to implement an affirmative action program.[8] The executive order and regulations require all government contractors to undertake an evaluation of their pattern of employment of minorities and women in all job categories. 41 C.F.R. § 60–2.11(a). Once the self-analysis is completed, the employer is to identify obstacles to the full utilization of minorities and women that may account for their representation in small numbers in particular categories. Having identified the obstacles, the employer is required to develop a plan to overcome those impediments to equal employment opportunity. 41 C.F.R. § 60–1:40.

The data gathered by Sears in the course of analyzing its employment system demon-

---

7. The Court found that the schools had made an offer to the general public through advertising in the "Yellow Pages" of the telephone directory and through mass mailings calculated to attract students. *See Scott v. Young,* 307 F.Supp. 1005 (E.D.Va.1969), *aff'd,* 421 F.2d 143 (4th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970) (Section 1981 prohibited racially motivated refusal of an amusement park proprietor to sell ticket of admission); *United States v. Medical Society of South Carolina,* 298 F.Supp. 145 (D.S.C.1969) (Section 1981 prohibited hospital's racially motivated refusal to render medical services).

8. Executive Order 11246 and regulations promulgated thereunder were issued pursuant to constitutional and statutory authority and therefore have the full force and effect of law. *Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 442 F.2d 159, 171 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Legal Aid Society of Alameda County v. Brennan,* 381 F.Supp. 125, 129–30 (N.D.Cal. 1974).

strated that there were few minority members employed in management positions with the company.[9] Sears, having considered the problem as directed by the regulations, determined that the solution lay in attracting greater numbers of qualified minorities to its management training program. Sears points out that the OFCCP regulations make specific suggestions for ways to remedy this problem. Among the suggested techniques to improve recruitment and increase the flow of minority or female applicants are active recruiting programs at schools with predominantly minority or female enrollments, recruiting efforts at all schools emphasizing special efforts to reach minorities, and special employment and summer work programs.[10] Sears explains that the recruitment program now under scrutiny was devised to disseminate information concerning employment opportunities in management positions to a targeted group of minority college students.[11]

The brochure advertising the program describes it as follows:

"An 11-week, working summer in a retail store in a major Eastern city. Students will be exposed to major areas of retailing including sales, auditing, customer

service, personnel, operations, merchandising, shipping and receiving.

. . . . .

"Sears recruiter will visit the students during the 11-week program to provide assistance and counsel. Local store management will guide the interns through the practical and theoretical phases of the program."

The purpose of the program was twofold:

"1. To provide the minority college student with an opportunity to learn what business and, specifically, retailing is all about.

"2. To cause those men and women who appear sufficiently enthused and motivated by retailing to seek a management career with Sears.

. . . . .

"Those who have completed the program have gained some insight into retailing in general and some have discovered a specific phase of the business that previously was unknown to them. Graduate interns have not only spent a summer earning while learning, but have found themselves better equipped to make career decisions as a result of the program.

---

9. In 1969 when Sears began the Summer Internship Program, only 2.5 percent of its officials and managers were minority members.

10. The regulations state, in relevant part:

"(e) Suggested techniques to improve recruitment and increase the flow of minority or female applicants follow:

. . . . .

(7) Active recruiting programs should be carried out at secondary schools, junior colleges, and colleges with predominant minority or female enrollments.

(8) Recruiting efforts at all schools should incorporate special efforts to reach minorities and women.

(9) Special employment programs should be undertaken whenever possible. Some possible programs are:

(1) Technical and nontechnical co-op programs with predominately Negro and women's colleges.

(ii) 'After school' and/or work-study jobs for minority youths, male and females.

(iii) Summer jobs for underprivileged youth, male and female.

(iv) Summer work-study programs for male and female faculty members of the predominantly minority schools and colleges.

(v) Motivation, training and employment programs for the hard-core unemployed, male and female.

11. With few nonwhites employed in management positions with Sears, the company realized that awareness of management employment opportunities could not be accomplished by word-of-mouth recruiting in the minority community. The Supreme Court has held that an employment practice neutral on its face which operates to perpetuate the effects of past discrimination is a violation of Title VII. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Courts have found that word-of-mouth recruiting by a substantially all-white work force has the effect of perpetuating the racial characteristics of the existing work force. *See Parham v. Southwestern Bell Tel. Co.*, 433 F.2d 421 (8th Cir. 1970); *EEOC v. Detroit Edison Co.*, 515 F.2d 301 (6th Cir. 1975), *vacated and remanded on other grounds*, 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267 (1977); *Long v. Sapp*, 502 F.2d 34 (5th Cir. 1974).

"In the past, many interns who appeared especially suited for retail management returned to Sears as executive trainees upon completion of their college educations."

Sears hoped that by stimulating the interest of this potentially qualified group, the company would be able to employ a greater number of minority members in management positions without granting preferential treatment to nonwhites in screening the applicants for the formal management program. The question presented is whether Sears' Summer Internship Program for Minority Students, voluntarily undertaken pursuant to an executive order, should be upheld as a legitimate affirmative action program that does not violate § 1981. Foreseeing that this question was bound to arise, the Court in *McDonald v. Santa Fe Trail Transportation Co., supra,* explicitly left its decision for another day, stating in footnote 8, " . . . [w]e emphasize that we do not consider here the permissibility of such a program, whether judicially required or otherwise prompted." [12]   427 U.S. at 281 n. 8, 96 S.Ct. at 2578. Sears' program was not judicially imposed.

## II.   *Voluntary Adoption of the Program*

Most of the cases in which the courts have been called upon to impose a remedy for racial discrimination by employers or others have arisen in the context of litigation contesting either the fact of discrimination or the responsibility for its existence. Neither of those aspects are present here. Without admitting that it had engaged in discriminatory employment practices in the past, Sears adopted its summer intern program without seeking court or administrative approval. Certainly there was pressure on Sears to make some changes in its employment practices to avoid a presumption of racial discrimination in the past, which could arise from its heavily disproportionate number of white store managers.

Affirmative action programs which were created by consent decrees containing a disclaimer of liability, e. g., *EEOC v. American Telephone & Telegraph Co.,* 365 F.Supp. 1105 (E.D.Pa.1973), *aff'd in part and rev'd in part on other grounds,* 506 F.2d 735 (3d Cir. 1974), have been approved by the courts. Overriding the necessity for "wasteful litigation and expense" and the "uncertainty of its outcome" before an administrative agency or a court is the admonition that

"the clear policy in favor of encouraging settlements must also be taken into account, see *Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960), particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals." *Patterson v. Newspaper & Mail Deliveries' Union of New York and Vicinity,* 514 F.2d 767, 771 (2d Cir. 1975), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).

■ It may be useful at the outset to make a point that will aid legal analysis. It is of little significance whether an affirmative action program is adopted voluntarily, or to avoid the risk of noncompliance with an Executive Order, *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), or imposed by a court as a remedy for past discrimination because required either by Title VII, *see United States v. Wood Lathers Local 46,* 471 F.2d 408 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); *Rios v. Enterprise Association Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974), or by § 1983, *see Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission,* 490 F.2d 387 (2d Cir. 1973).

■ In testing whether an affirmative action system carries reverse discrimination

---

**12.** In *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), the merits of which the Court declined to decide, an opinion by Mr. Justice Douglas contended that any use

of racial criteria in admitting students to a law school was per se unconstitutional regardless of whether it hurt blacks or other minorities.

so far as to have impermissible effects, it is appropriate to confine scrutiny to the program itself, regardless of how or why it came into being. The fact that Sears voluntarily took affirmative action without admitting any past discrimination does not invalidate the action taken. Employers should not be discouraged from taking voluntary measures to remedy perceived imbalances in their work force. *See Germann v. Kipp,* 429 F.Supp. 1323 (W.D.Mo.1977). On the other hand, the voluntary adoption of the program does not insulate it from challenge for reverse discrimination. However, if "reverse discrimination" is found, the reasons for the adoption of the program may bear some weight in determining whether that discrimination is statutorily or constitutionally permissible.[13]

### III. *Plaintiff's Claim of Exclusion From the Management Trainee Program*

Plaintiff seeks recovery for his exclusion not only from the summer internship program but also from the following year's job as an executive trainee. These were separate and distinct jobs, and the qualifications for each were different.. His claim that he was denied a position as management trainee will be considered first.

■ Hollander's exclusion from the summer plan had at best a tenuous relationship to his prospects for a continuing employment relationship "as [an] executive trainee upon completion of [his] college education" as described in Sears' enlistment brochure. Unlike the medical school in *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977), and the law school in *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), each of which had a fixed number of openings in an entering class, Sears had no such limitation on the number of executive trainees for retail management positions, a distinction noted in *Rios, supra,* 501 F.2d at 630 n. 6. Furthermore, participation in the summer intern program was not a prerequisite for the executive trainee program. Thus plaintiff's exclusion from the summer internship program left him in a markedly different position than the plaintiff in *Chance v. Board of Examiners,* 458 F.2d 1167, 1170 (2d Cir. 1972), who sought to obtain a permanent supervisory job in the New York City school system, and was excluded from an eligibility list which would have been the sole reservoir for appointments. It is clear enough that in this context the plaintiff was not excluded from a job as a management trainee; indeed, he never tried to obtain such a position.[14] Nor was the internship program a constructive seniority system. *See Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96

**13.** In *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Court used language arguably counselling judicial restraint where local school boards have made good faith attempts to remedy segregation in schools. And, in *Joyce v. McCrane,* 320 F.Supp. 1284 (D.N.J.1970), the court upheld an "Affirmative Action Plan" devised by the State of New Jersey for the construction industry in compliance with Executive Order No. 11246, which required each contractor to make a good faith effort to employ 30–37 percent of minority journeymen in proportion to his entire work force. *See also Associated Gen. Contractors of Mass., Inc. v. Altshuler,* 490 F.2d 9, 16 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974).

The EEOC has taken steps to provide protection of employers against "reverse discrimination" charges, if they have affirmative action plans which pass its tests for reasonability. Such plans may include numerical rates, conscious goals and time tables if they are "reasonable under the facts and circumstances." 46 U.S.L.W. 2352. For the full text *see* 42 Fed.Reg. 64826 (1977). The quoted standard is considerably broader than the judicially fashioned one in *EEOC v. Local 638 . . . Local 28, Sheet Metal Workers,* 532 F.2d 821 (2d Cir. 1976) upon which I rely in this case. *See infra* at 506.

**14.** In a situation where only a limited number of benefits are available, as in *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976), *cert. granted,* 429 U.S. 1090, 97 S.Ct. 1098, 51 L.Ed.2d 535 (1977) which is now sub judice before the Supreme Court, "reverse discrimination" may have the effect of denying the benefit to an otherwise more qualified applicant. *Cf. Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972).

S.Ct. 1251, 47 L.Ed.2d 444 (1976). There was no evidence to indicate that interns were given any priority placement or that their experience in the summer program had any relationship to their subsequent job abilities. Nor was there any evidence that other routes to a management trainee position were blocked. Although 35 of 140 interns were accepted as management trainees over a six-year period, this was a shade less than five percent of all management trainees hired during the same period. *See* note 3, *supra.*

Plaintiff cannot claim that he was excluded from a group he did not seek to join. It does not follow that because Sears made a special effort to recruit minority applicants to enter the management trainee program Hollander was excluded from entering it. Even if a precise and technical theory of contract is applied, the failure to accept him into the summer internship program did not amount to a refusal to accept an offer by him to become a management trainee a year later, after graduation from college, so as to constitute a violation of his rights under § 1981. This, however, does not end the case.

### IV. *The Summer Intern Program*

Having seen that Sears' affirmative action program for minorities had no exclusionary impact on whites seeking regular employment, the next question is whether the summer program for recruiting more minority applicants, considered by itself, should be construed as falling within the ambit of § 1981's right "to make and enforce contracts."

### A. *The Scope of "Contract" in § 1981*

Before considering whether Sears' program had an impermissible effect on whites, a preliminary inquiry is whether the Sears plan is substantively the *kind* of proposal that was contemplated by § 1981. The Supreme Court has not yet been asked to rule on whether certain kinds of relationships, although contractual in form, may be of a kind as not to fall within the ambit of § 1981. One such kind, suggested in dictum

by Mr. Justice Powell in his concurring opinion in *Runyon,* would be a noncommercial, private relationship, not "offered generally or widely . . . ." 427 U.S. at 189, 96 S.Ct. 2586. The validity of the concept that some kinds of contracts even though racially motivated adversely against minorities might not violate § 1981 is emphasized by Mr. Justice Powell's statement, *id.* at 188, 96 S.Ct. at 2603: "I do not suggest that a 'bright line' can be drawn that easily separates the type of contract offer within the reach of § 1981 from the type without."

### B. *Summer Interns As Employees Or Student Observers*

The arrangement offered by Sears for the recruitment of trainee applicants from minority groups, although it may have many indicia of an employment contract is, in substance, realistically different. In *Runyon* the unaccepted students were willing to pay the regular tuition charges in exchange for a lengthy period of educational instruction in a school operated as a private commercial venture. Sears' plan went in a diametrically opposite direction. Its summer interns were not paid by Sears to fill regular positions as stock boys, inventory-takers, cashiers, salesmen, clerks, or in the complaint department. They were paid to come in and observe the performance of such jobs, to try them out for short periods, and to be taught the relationships among various positions.

As the brochure pointed out, the plan operated "to provide the minority college student with an opportunity to learn what business and specifically, retailing is all about." The status of interns was that of "students" who would be provided with "assistance and counsel" by Sears' recruiter, and they were to be guided by store management through the "practical and theoretical phases of the program." In brief, the object of the payment to an intern was not to have him work as an employee in carrying on Sears' retail business; rather, it was payment to secure his attention to the manner in which Sears' regular employees

worked in carrying on all phases of its retail business as they were conducted under the supervision of a store manager. This was not a hiring program; it was a recruiting program. It was not even an apprenticeship program as in *EEOC v. Local 638 . . Local 28, Sheet Metal Workers,* 532 F.2d 821 (2d Cir. 1976). In substance it was not a contract for services between an employer and employee.

## C. *Exclusion of Plaintiff*

It thus becomes clear that the opportunity denied to plaintiff by reason of his race was not in the strictest sense an employment opportunity, but rather an opportunity to receive special orientation in the retailing business while drawing a token salary. Plaintiff's exclusion from the program did not deprive him of a *job* with Sears. Indeed, he was offered a regular summer job, but refused it, saying, "I don't want a job as a stock boy." As previously noted, his exclusion from the summer program did not adversely affect any opportunity to be accepted as a management trainee. Insofar as any other possible item of damage is concerned, he has proved no injury.[15] He obtained another summer job which paid him more money than he would have received as a summer intern.

**15.** In *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Court affirmed the awarding of compensatory damages for embarrassment, humiliation and mental anguish to blacks in a § 1981 action. Although the rhetoric of constitutional equality could be expressed by the plaintiff, I am not persuaded that he has a passion for equality so great that he, a white person, felt that he was in any way stigmatized, or that his right to enjoy a fully human existence was in any way impaired or jeopardized. From the meager evidence relevant to the impact of this case on his psyche, I do not believe that his sensibilities were offended. Rather, I am of the impression that his self-respect would have been enhanced had he been defending Sears in this case if it had been brought by some other junior at Wesleyan.

**16.** In *Electrical Workers Local 790 v. Robbins & Myers, Inc.,* 429 U.S. 229, 236, 97 S.Ct. 441, 447, 50 L.Ed.2d 427 (1976), the Court noted the "independence of Title VII remedies . . .

## V. *Discriminatory Effect on Non-Minority Applicants*

Even if admission into the summer intern program would have created a relationship within the scope of "contract" as construed in § 1981, the effects of the "reverse discrimination" which resulted from plaintiff's exclusion were not so impermissible as to violate that statute. There are many laws which require that an employer must be color-blind in the selection of his employees, *e. g.,* the United States Constitution, amendment 13; § 703(a), (b) or (j), 42 U.S.C. § 2000e–2(a), (b), (j) of the Civil Rights Act of 1964; Executive Order No. 11246.[16] *See EEOC v. American Telephone & Telegraph Co.,* 419 F.Supp. 1022 (E.D.Pa.1976), *aff'd,* 556 F.2d 167 (3d Cir. 1977). The problems presented by the tension between "reverse discrimination" in affirmative action programs and laws prohibiting racial discrimination are disparate and complex, but not completely intractable. That the rights of those on either side of the line between the majority and minority are not absolute is exemplified by cases deciding such problems. There is no generally accepted standard for resolving the competing interests at stake. The Court of Appeals in this circuit has enumerated certain factors that should be taken into account in determining to what extent "reverse discrimination" effects of an af-

available to an aggrieved employee." Remedies could also be sought from employers under § 1981, *see Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), or from unions under the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A), *see, e. g., Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); *Local 12, United Rubber Workers v. N.L.R.B.,* 368 F.2d 12, 17 (5th Cir. 1966), *cert. denied,* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967), or from government contractors (who are required to take affirmative action to ensure equal employment opportunities) under Executive Order No. 11246, 3 C.F.R. 339 (1964–1965 Comp.) *reprinted in* 42 U.S.C. § 2000e note (1970); *see Contractors Ass'n v. Secretary of Labor,* 442 F.2d 159, 171–72 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

firmative action program are permissible. One aspect of the problem is whether temporary quotas with reverse discrimination effects are justified. This case does not present that issue. The other part of the problem is the solution, that is to say, *how much* "reverse discrimination" is permissible. Reverse discrimination is justifiable if its effects are not " 'identifiable,' that is to say, concentrated upon a relatively small, ascertainable group of non-minority persons." *EEOC v. Local 638 . . . Local 28, Sheet Metal Workers,* 532 F.2d 821, 828 (2d Cir. 1976). *See also Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 427 (2d Cir. 1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84. In this respect, whatever adverse effects the Sears internship program may have had on non-minority individuals, they were even less than those in *Rios, supra,* where a union had been ordered to admit minority applicants to its apprenticeship program in sufficient numbers to achieve a goal of 30 percent non-white membership. Since the pool of apprentices was the sole source from which union steamfitters could be obtained in the construction industry, it is obvious that the effect of that order was to exclude whites. But none of the college juniors who were the targets of Sears' plan had yet "embarked upon a [management trainee] career with the expectation of advancement only to be now thwarted because of their color alone." *Cf. Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,* 482 F.2d 1333, 1341 (2d Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975).

The Sears plan had no direct impact on the opportunity of whites to become store management trainees. The summer plan was not the sole reservoir from which management trainees were drawn. The objective result of the plan was that it still left Sears with 95 percent of its trainees members of the white race. As shown in note 3, *supra,* the plan created a small, trickling stream which over a period of six years contributed only 35 management trainees from minority groups into an otherwise unrestricted pool from which 754 management trainees were taken.

The Sears program was created in an effort to correct racial inequality, and not to perpetuate it. The desirable social and economic effects of programs that serve to increase minority employment in fields traditionally dominated by whites are too obvious to require elaboration. Admittedly, these desirable effects do not by themselves insulate Sears from liability for discrimination. Nor does "[t]he existence of a permissible purpose . . . sustain an action that has an impermissible effect." *Wright v. Council of City of Emporia,* 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972). However, the courts' task is to determine what kinds of discriminatory effects are permissible. As I have summarized above, the discriminatory impact of Sears' program upon Caucasians was slight or even negligible. Such a minor impact from the racial classification in Sears' program may be tolerated. As stated in a related context in *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 931–32 (2d Cir. 1968):

"What we have said may require classification by race. That is something which the Constitution usually forbids, not because it is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality. Where it is drawn for the purpose of achieving equality it will be allowed, and to the extent it is necessary to avoid unequal treatment by race, it will be required." (footnotes omitted).

*See also Offermann v. Nitkowski,* 378 F.2d 22, 24 (2d Cir. 1967). Executive Order No. 11246 was promulgated to open doors to full and equal economic opportunities in the job market to members of minority groups. Since all that Sears' plan operated to do was to show that group that its door was open to them, it had no impermissible adverse impact on the economic opportunities of the plaintiff.

Let judgment enter for defendant.

SO ORDERED.